**UNITED STATES of America,**
**Plaintiff-Appellee,**

v.

**Anthony ZITO and Vincent Zito,**
**Defendants-Appellants.**

**Nos. 76, 77, Dockets 72–1290, 72–1291.**

United States Court of Appeals, Second Circuit.

Argued Sept. 19, 1972.

Decided Oct. 6, 1972.

John T. Spotila, Atty., Dept. of Justice, Washington, D.C. (Robert Morse, U. S. Atty., E. D. N. Y., Sidney M. Glazer, Atty., William T. Murphy, Special Atty., Dept. of Justice, on the brief), for appellee.

James M. La Rossa, New York City (Ronald P. Fischetti and Gerald L. Shargel, New York City, on the brief), for appellants.

Before FRIENDLY, Chief Judge, and LUMBARD and FEINBERG, Circuit Judges.

LUMBARD, Circuit Judge:

Anthony and Vincent Zito were convicted in a jury trial before Judge Dooling in the Eastern District of New York of violating 18 U.S.C. § 894, which prohibits "the use of any extortionate means (1) to collect or attempt to collect any extension of credit, or (2) to punish any person for the nonrepayment thereof." Both defendants were sentenced to four years imprisonment. We affirm the convictions.

The facts as they appear from the government's case [1] indicate that in March, 1968, the gas station owned by Edward Doran, the government's chief witness, was robbed and approximately $3500 was taken. Unable to borrow money from commercial lending institutions, Doran, who wanted to replace the money quickly, went to Vincent Zito and obtained a loan of $3500, agreeing to pay $175 per week. It subsequently developed that this $175 represented 5% per week interest alone. Late charges of 1% per day were assessed for delayed

---

1. The defendants did not call witnesses or testify in their own defense.

payments, and if an installment was missed, the entire $175 plus accrued late charges was treated as a new loan with a resultant increase in each weekly interest payment.

Doran was hard pressed to meet these installments and soon fell behind. In April, 1968, he went to his wife's parents and they agreed to lend him $1400 to give to Vincent Zito. Later that summer Doran obtained a $4000 second mortgage on his home, the proceeds of which he also gave to Vincent Zito. Nevertheless, by the fall of 1968 Doran told Zito that he was broke and could pay nothing more. Not long after, an associate of Vincent Zito's named Andy Strauss contacted Doran. Strauss, who had been living in Zito's house since March, 1968, claimed that "Vinnie" Zito had told him to enlist Doran in a planned truck hijacking, which would enable Doran to raise money to help pay off the loan. Doran eventually agreed to participate in this and other illegal ventures for the purpose of raising money to pay to the Zitos.

Despite these efforts, by February, 1969, Doran's debt had climbed to $13,000. Unable to make further payments, and afraid for his safety, on March 11, 1969, Doran left New York for Wyoming. While he was thus in hiding, Vincent and Anthony Zito and one Danny Zippfel met with Mrs. Doran, her father and her brother. Mrs. Doran testified that the Zitos told her that her husband "better come back because . . . he couldn't run away from them. No matter where he ran they would find him. And they wanted their money." Mrs. Doran said that this meeting made her "upset" and "afraid." She also testified to a later phone conversation with Joey Zito, brother of Vincent and Anthony Zito and an unindicted co-conspirator, where Joey said that "they" would be coming out to see her if her husband did not return. A few days later, after being told of these conversations by his wife, Doran returned home to New York.

Doran continued to borrow money from relatives and to work at various jobs until November, 1969, when he learned that a warrant had been issued for his arrest in connection with his part in the robbery of a Long Island bank with Strauss and several others. Doran turned himself in to the police and eventually agreed to work with the FBI by supplying information about his dealings with Anthony and Vincent Zito. Pursuant to this agreement, he subsequently participated in two conversations with Anthony Zito in a Times Square restaurant which were taped by the FBI.

At the trial in addition to Edward Doran the prosecution called Mrs. Doran, Paul Gattus (Mrs. Doran's brother), Grace Gattus (Mrs. Doran's mother), Barbara Ahearn (Edward Doran's sister), Virginia Rogers (Edward Doran's cousin), and Raymond Rogers (Virginia Rogers' husband). These witnesses testified to statements made by Doran, paralleling his direct testimony, concerning the nature of his loan from the Zitos, his attempts to repay it, and the Zitos' threats of what would happen if he failed to make the payments. Appellants assert that this testimony about consistent out of court statements by the government's chief witness served only to corroborate and bolster his direct testimony. They contend that such statements were inadmissible under the usual rule that prior consistent statements can only be introduced after a charge that a witness's story is a recent fabrication and where the statements were made before any motive to fabricate developed. Felice v. Long Island Railroad, 426 F.2d 192, 197, 198 (2d Cir. 1970), cert. denied, 400 U.S. 820, 91 S.Ct. 37, 27 L.Ed. 2d 47; United States v. Fayette, 388 F. 2d 728, 735 (2d Cir. 1968); United States v. Sherman, 171 F.2d 619, 622 (2d Cir. 1948), cert. denied sub nom. Gimaldi v. United States, 377 U.S. 931,

69 S.Ct. 1484, 93 L.Ed. 1738; Proposed Federal Rules of Evidence, 801(d)(1)(B) (submitted to the Supreme Court in November 1971).

■ Examination of the record convinces us that these statements were admissible. The defense attorney's opening statement to the jury [2] and his persistent inquiries during the cross-examination reflected an intense interest in the fact that Doran had committed many crimes in his attempts to raise money for the Zitos for which he had not been indicted. In this manner "the defense at least suggested to the jury that [the prosecution's principal witness] hoped for clemency for himself, and that his trial testimony was a fabrication, as a reward for which he hoped to go unwhipped of justice." People v. Singer, 300 N.Y. 120, 123, 89 N.E.2d 710, 711 (1949). A trial judge normally has great discretion in determining if a prior consistent statement is authorized to rebut a defense charge of recent fabrication, Felice v. Long Island Railroad Company, 426 F.2d 192, 198 (2d Cir. 1970), cert. denied, 400 U.S. 820, 91 S.Ct. 37, 27 L.Ed.2d 47, and we cannot say here, in light of the obvious motive to falsify, that the trial judge erred in drawing the inference that the defense had suggested that Doran had concocted his story to escape punishment.

■ Appellants also object to another part of the testimony by Doran's relatives on a different ground. They claim that the testimony which reflected on Mrs. Doran's state of mind during the period of her husband's dealings with the Zitos should have been excluded.[3] While admitting that where the alleged crime is related to extortion the fearful state of mind of the victim (here Edward Doran) is relevant, Nick v. United States, 122 F.2d 660, 671 (8th Cir. 1941), cert. denied, 314 U.S. 687, 62 S.Ct. 302, 86 L.Ed. 550, they assert that testimony concerning Mrs. Doran's fear is irrelevant to any issue in the case and should have been excluded because of its purportedly highly prejudicial impact on the jury.[4] We disagree with this conclusion. Where an effort has been made to frighten a victim of extortion by intimidating his wife and using her as a conduit through which to pass threats to her husband, we cannot say that the introduction of evidence as to her reactions is error. Mrs. Doran's state of mind under such circumstances was surely relevant to the state of mind of her husband who was the subject of the extortion.

2. Defense counsel argued to the jury:
   I think you are going to find Mr. Doran to be a man who committed not one but a number of crimes and when the noose came around his neck—I think we will prove to you that he reached out for assistance, said that he would cooperate with the Government and he chooses [sic] two boyhood friends and he walked away from a heinous bank robbery, where his co-defendants received 15 years, with a suspended sentence.

3. Mrs. Doran was allowed to testify that during her meeting with the Zitos while her husband was in Wyoming she was "upset . . . sick . . . [and] afraid." She also testified that she had told Joey Zito over the telephone, when talking to him about her husband's absence, that "I was afraid." Finally, during Grace Gattus' testimony about the $1400 loan to the Dorans, she stated that

her "daughter [Mrs. Doran] was very upset; she was crying."

4. Appellants also claim that the statements concerning Mrs. Doran's state of mind involve hearsay and should have been excluded on that basis. Of the examples cited by appellants, only the testimony by Mrs. Doran that she had told Joey Zito during their telephone conversation that she was afraid involved an out of court statement offered for its truth. However, the statement was introduced to show Mrs. Doran's state of mind at the time and thus falls within the state of mind exception to the hearsay rule so long as her mental condition is a relevant issue. C. McCormick, Handbook of the Law of Evidence § 269 (1954); 6 J. Wigmore, Evidence §§ 1714, 1730 (3rd ed. 1940), Proposed Federal Rules of Evidence 803(3) (submitted to the Supreme Court in November 1971).

■ Appellants raise two objections based upon the trial court's allegedly improper admission of evidence concerning Andy Strauss' activities. They assert that it was error to allow testimony by Edward Doran about statements made by Strauss because there was insufficient independent evidence linking him to the Zitos which would allow the inference that Strauss was their agent or a co-conspirator in the extortion scheme. Because of this asserted failure adequately to connect Strauss' actions with the Zitos, appellants also contend that Strauss' illegal activities constituted a separate and distinct conspiracy and that the introduction of evidence concerning this unconnected conspiracy was prejudicial and constituted reversible error. We need not tarry long over these contentions since we find adequate evidence in the record linking Strauss with the Zitos. For example, it appears not only that Strauss lived with the Zitos for much of the period with which we are concerned, but also that he and Doran met inside Vincent Zito's apartment on the day of the bank robbery and went from there to join the other robbers. Later, Anthony Zito secured an attorney to represent Doran in defense of the bank robbery charge which grew out of this illegal activity with Struass. Thus, no error was committed in permitting evidence of Strauss' actions in the Zitos' trial.

■ As a final matter, appellants claim that the judge committed error in allowing Doran to testify that he was frightened when Anthony Zito mentioned the name of "Carmine" during one of the taped conversations because "Carmine" was reputed to be a tough character. There is no merit to the contention that the government was putting a third person's reputation in issue or trying to prove guilt by association. We agree that the government was merely attempting to prove that the mention of the name "Carmine" was a veiled threat by Anthony Zito. As such it was certainly admissible.

Affirmed.