**UNITED STATES of America, Appellee,**

v.

**Leonard DiMARIA, Appellant.**

**No. 465, Docket 83–1292.**

United States Court of Appeals, Second Circuit.

Argued Nov. 23, 1983.

Decided Feb. 6, 1984.

Norman A. Olch, New York City, for appellant.

Diane F. Giacalone, Asst. U.S. Atty., E.D. N.Y., Brooklyn, N.Y. (Raymond J. Dearie, U.S. Atty., E.D.N.Y., L. Kevin Sheridan, David V. Kirby, Asst. U.S. Attys., Brooklyn, N.Y.), for appellee.

Before FRIENDLY, MANSFIELD and KEARSE, Circuit Judges.

FRIENDLY, Circuit Judge:

Appellant Leonard DiMaria was convicted in the District Court for the Eastern District of New York, after trial before Judge Bramwell and a jury, on three counts of an indictment charging, respectively, possession of cigarettes stolen while moving in interstate commerce in violation of 18 U.S.C. § 659 (Count III), possession of contraband cigarettes in violation of 18 U.S.C. § 2342 (Count IV)[1] and conspiracy to commit both substantive offenses in violation of 18 U.S.C. § 371 (Count I). He was sentenced to ten years imprisonment on Count III and to five years imprisonment on Counts I and IV, the sentences to run concurrently.[2]

The Government's proof established the following: On February 9, 1981, John Bott drove a tractor-trailer containing 950 cases of Philip Morris cigarettes worth over $200,000, from Richmond, Virginia, toward its ultimate destination in Jersey City, New Jersey. One night during the course of the trip Bott pulled into a rest area on the New Jersey Turnpike and went to sleep in the cab of his truck. He was awakened by a man who placed a gun to his head and ordered him to surrender his rig. Bott was removed from the cab of the tractor and placed in the rear of a van. When, several hours later, he was released from the van, his tractor-trailer and its load of cigarettes were gone.

Shortly thereafter Robert Russell, a longtime associate of one of DiMaria's co-defendants, Anthony Billeci, received a telephone call from another co-defendant asking him to go to the Tunnel Diner in Jersey City. Russell there met Irving Birnbaum, Anthony Billeci and John Gouker, all co-defendants, and a fourth unidentified man. They discussed using a storage yard at the Walsh Trucking Company in Jersey City to store a stolen trailer that Billeci and Birnbaum had obtained until they could find a buyer for the load. Gouker made arrangements with John DiRoma, the yard manager, also a co-defendant, to use the yard of the Walsh Trucking Company in Jersey City.

On February 14 the FBI began a surveillance of the yard and two refrigerated trucks therein, which bore the logo IRL on the side, and the New York City Police Department began surveillances on Billeci and Birnbaum in response to information that a truckload of cigarettes had been hijacked. At approximately 8:50 p.m. on February 17, the City detectives observed Billeci and Birnbaum arrive at a social club on Glenwood Road in Brooklyn that DiMaria frequented. After an hour Billeci and Birnbaum walked outside the club with DiMaria and an unidentified male. After a brief conversation Billeci and Birnbaum left in Birnbaum's Cadillac while DiMaria and the unidentified man left in another car.

Late the following evening, February 18, Billeci and Birnbaum again drove to the social club. Over the next two hours, until about 2:00 a.m., Billeci, Birnbaum and DiMaria repeatedly left the club, talked while walking up and down the sidewalk, and then reentered the club.

On the afternoon of the next day, February 19, co-defendant Anthony Apice rented a Hertz tractor. Two men drove the tractor to the Walsh Trucking yard and when unable to open the gate, drove three blocks away where Billeci and Birnbaum, in the latter's Cadillac, pulled alongside. The men returned to the Walsh yard, unlocked the gate, and unsuccessfully attempted to connect the tractor to one of the IRL trailers. Billeci and Birnbaum arrived in time to see

---

**1.** 18 U.S.C. § 2341(2) defines contraband cigarettes as follows:

the term "contraband cigarettes" means a quantity in excess of 60,000 cigarettes, which bear no evidence of the payment of applicable State cigarette taxes in the State where such cigarettes are found, if such State requires a stamp, impression, or other indication to be placed on packages or other containers of cigarettes to evidence payment of cigarette taxes. . . .

**2.** The following individuals were indicted with the defendant and pleaded guilty: Anthony Billeci, Irving Birnbaum, John Gouker, Joseph John DiRoma, Anthony Apice, James Dellaretta, Joseph Monteleone, Salvatore Miciotta and Alexander Antoniato.

this debacle. The second trailer was then attached to the Hertz tractor and was pulled from the yard. Billeci locked the gate, and he and Birnbaum left.

The Hertz tractor and the IRL trailer were then driven to the Best Deli in Brooklyn, where the drivers were replaced by another pair who drove the rig to the Brooklyn Terminal Market. The rig was followed by an Oldsmobile which had been seen near DiMaria's social club on the two evenings when he met with Billeci and Birnbaum. In the storage yard at the Brooklyn Terminal Market, the tractor was unhitched from the IRL trailer and was driven back to the Best Deli where the new crew left. Billeci's and Birnbaum's men replaced them, and the tractor, Billeci and Birnbaum left the area. The trailer remained at the yard, being guarded through the night by the Oldsmobile and its unidentified occupant.

On the next day, Friday, February 20, the second IRL trailer arrived at the Terminal Market and was positioned near the first. An "S & R" van leased by Richard Lustparten entered the yard and approached the trailers. Cases of cigarettes were loaded from the trailers into the van. Early in the evening co-defendants Sal Miciotta and Joseph Monteleone arrived at the market and maintained guard over the two trailers throughout the night. The denouement came about 4:00 p.m. on Saturday, February 21. A white Cadillac led a Barn rental van into the market. Each vehicle carried two passengers. DiMaria got out of the Cadillac and directed the van as it backed up into the space between the two IRL trailers. The four men loaded the van with cigarettes from the trailers; one case was cut open on the loading dock. DiMaria and Miciotta started to drive away in the Cadillac and the two other men prepared to depart in the Barn van. The FBI agents stopped both vehicles. They found in the Cadillac a half-case in the trunk. A search of Miciotta revealed a number of keys

which fit the locks of the doors of the two IRL trailers and three tally sheets, one of which read

OUT LOADS

| DATE | NAME | CASES |
|------|------|-------|
| 2/20 | RICH & LENNY | 15 Merit |
| | | 15 Parl |
| | | 10 Marl 100 |
| | | 10 B & H 100[,][3] |

and a part of the bill of lading taken from John Bott containing a computer print-out listing of the contents of the original trailer as it had left Philip Morris in Richmond. Execution of search warrants recovered 670 cases of assorted Philip Morris cigarettes from the trailer, and 45 cases of various brands from the Barn rental van.

Joseph Brederhoft, a Special Agent of the Bureau of Alcohol, Tobacco and Firearms of the Treasury Department, testified to the meaning and application of the statute in regard to contraband cigarettes, see *supra* note 1. A case contains 12,000 cigarettes; hence the statute applies to shipments in excess of five cases. All of the continental states require that cigarettes have some sort of tax stamps applied. "Bootleg cigarettes" are those purchased in a low-tax state, *e.g.*, North Carolina, and then transported to a high-tax state, *e.g.*, New York. In the nine years in which he had been involved in tobacco investigations, he had never become aware of a seizure of bootleg cigarettes in a quantity over 50 cases or of a seizure of contraband cigarettes as large as that here, when the cigarettes had not been stolen; when cigarettes recovered by the agency bore no tax stamps at all, these were invariably stolen. It was stipulated that Philip Morris sells cases of untaxed cigarettes only to properly licensed entities and that the load here in question consisted of untaxed cigarettes.

## DISCUSSION

■ Three of the four points raised by DiMaria require little discussion. To begin,

---

**3.** The Government plausibly contends that this reflects the removal of 50 cases of cigarettes by Richard Lustparten and appellant Leonard Di-

Maria on February 20 when the agents saw cigarettes being loaded into the "S & R" van rented by Lustparten.

the claim of insufficiency of the evidence to show DiMaria's possession and guilty knowledge is specious. We observed in *United States v. Monica,* 295 F.2d 400, 402 (2 Cir.1961), *cert. denied,* 368 U.S. 953, 82 S.Ct. 395, 7 L.Ed.2d 386 (1962), that "[l]ike any other element in the prosecution's case, possession need not be proved by direct evidence but may be established by proof permitting an inference to be drawn beyond reasonable doubt", and each element of proof "gain[s] color" from others, *id.* at 401. See also *United States v. Tramunti,* 500 F.2d 1334, 1338 (2 Cir.), *cert. denied,* 419 U.S. 1079, 95 S.Ct. 667, 42 L.Ed.2d 673 (1974); *United States v. Mohabir,* 624 F.2d 1140, 1144 (2 Cir.1980). The evidence, which we have recited in tiresome detail, amply permitted inferring beyond a reasonable doubt that the possession of the cigarettes by others was in DiMaria's behalf at least from the discussion at DiMaria's social club on the night of February 18. Indeed, so far as concerned the case of cigarettes discovered in DiMaria's Cadillac, the evidence justified a finding of possession directly by him. Once a jury found possession beyond a reasonable doubt, the Government was entitled to the benefit of the principle, stated in *Wilson v. United States,* 162 U.S. 613, 619, 16 S.Ct. 895, 898, 40 L.Ed. 1090 (1896):

> Possession of the fruits of crime, recently after its commission, justifies the inference that the possession is guilty possession, and, though only *prima facie* evidence of guilt, may be of controlling weight unless explained by the circumstances or accounted for in some way consistent with innocence.

See *Barnes v. United States,* 412 U.S. 837, 843–44, 93 S.Ct. 2357, 2361–62, 37 L.Ed.2d 380 (1973).

DiMaria's second point concerns a remark in the prosecutor's rebuttal summation. After telling the jury that both DiMaria and the Government were entitled to its fair consideration, the prosecutor said that John Bott, the driver of the hijacked truck, was likewise entitled to this. He stated:

John Bott testified that he had a gun put to his head and a quarter of a million dollars were—of cigarettes were stolen from him at gunpoint. And I suggested in my opening and I suggest again, that there is only one reason that that gun was put to his head and that's because someone was prepared to buy those stolen cigarettes, and that someone, Ladies and Gentlemen, the evidence has shown was Leonard DiMaria.

The district judge denied a motion for a mistrial by counsel for the defendant and did not give any curative instruction. The only criticisms of the summation warranting discussion are that the jury might have understood the remark as claiming that DiMaria was implicated in the hijacking although this had not been charged and no sufficient evidence had been offered to support it, or as having asked the jury to "do something" about hijacking in violation of the comments in *United States v. Barlin,* 686 F.2d 81, 93 (2 Cir.1982) (summation) and *United States v. Terry,* 702 F.2d 299, 313 (2 Cir.) (instruction), *cert. denied,* ___ U.S. ___, 103 S.Ct. 2095, 77 L.Ed.2d 304 (1983). Although the reference to Bott was pointless rhetoric, and would better have been omitted, we perceive no sufficient ground for reversal. When the summations are read as a whole, it is clear that the Government had never sought to cast DiMaria as a person responsible for the hijacking; its contention was that he emerged soon after as a potential buyer. To tell a jury that hijackings would not occur if there was no market for stolen goods is hardly news. The prosecutor's suggestion that the evidence pointed to DiMaria as an element in this market was not improper.

There is even less merit in DiMaria's third point, namely, that the trial judge erred by including in his charge on guilty knowledge that this could be established by showing that a defendant deliberately closed his eyes to facts which should prompt him to investigate. Recognizing that we have upheld such a charge, *United States v. Joyce,* 542 F.2d 158, 161 (2 Cir.) (per curiam), *cert. denied,* 429 U.S. 1100, 97 S.Ct.

1122, 51 L.Ed.2d 548 (1976); *United States v. Mohabir, supra,* 624 F.2d at 1154, DiMaria argues that here there was no evidence of any eye closing on his part. While inclusion of this language in the charge may have been unnecessary, it was not inappropriate in view of DiMaria's efforts to keep a distance between himself and the cigarettes until the last moment. Indeed, given DiMaria's contention that he thought the cigarettes were bootleg and not stolen, see *infra,* the jury should be entitled to decide whether DiMaria maintained this belief only as a result of a studied effort to avoid the truth by disregarding the unusual circumstances surrounding the transaction.

 We thus come to the serious point raised by DiMaria. The defense sought to elicit from FBI Special Agent MacDonald that as the agents approached him, DiMaria said:

> I thought you guys were just investigating white collar crime; what are you doing here? I only came here to get some cigarettes real cheap.

The defense contended that cheap or even "real cheap" cigarettes meant bootleg cigarettes, *i.e.,* cigarettes brought from a low-tax state for sale in a high-tax state, rather than stolen cigarettes, and that the statement thus tended to disprove the state of mind required for conviction under 18 U.S.C. § 659 (Count III), and also under the conspiracy count which charged a conspiracy to violate both 18 U.S.C. § 659 and 18 U.S.C. § 2342, since the jury was charged that it could convict if it found DiMaria guilty of conspiring to commit either crime. The defense did not explain with particularity why the statement was not inculpatory rather than exculpatory with regard to Count IV which charged possession of contraband cigarettes in violation of 18 U.S.C.

§ 2342; the theory must be that the reference to getting "some cigarettes real cheap" could be considered by the jury as negating an intention to possess a quantity in excess of 60,000 which § 2341(2) requires for a conviction. Admissibility was predicated on Fed.R.Evid. 803(3) which excepts from the hearsay rule, even though the declarant is available as a witness:

> A statement of the declarant's then existing state of mind, emotion, sensation, or physical condition (such as intent, plan, motive, design, mental feeling, pain, and bodily health), but not including a statement of memory or belief to prove the fact remembered or believed unless it relates to the execution, revocation, identification or terms of declarant's will.[4]

After hearing argument, the judge excluded the statement.

Our decision in *United States v. Marin,* 669 F.2d 73, 84 (1982), which the Government cited to the judge as dispositive in its favor, is totally irrelevant. We there upheld the exclusion of a portion of a post-arrest statement by the defendant Romero that a co-defendant, Marin, had placed a bag of narcotics in Romero's car. This was not a statement of Romero's existing state of mind; it fell squarely within the exception to the Rule 803(3) exception banning "a statement of memory or belief to prove the fact remembered or believed."

The Government's claim that, apart from the authority of *Marin,* DiMaria's statement falls within the exception to the exception is baseless. The Advisory Committee's Notes explain that the exception to the exception was "necessary to avoid the virtual destruction of the hearsay rule which could otherwise result from allowing state of mind, provable by a hearsay statement,

---

4. DiMaria contends on appeal that the statement was also admissible because it was a "verbal act" and thus not within the definition of hearsay in Rule 801. Even if this contention were properly before us, which we doubt, see McCormick, Evidence § 51, at 112 n. 15 (Cleary 2d ed. 1972), and cases there cited; *United States v. Lara-Hernandez,* 588 F.2d 272, 274 (9 Cir.1978) (per curiam); *Huff v. White Motor Corp.,* 609 F.2d 286, 290 (7 Cir.1979);

*United States v. Anderson,* 618 F.2d 487, 491 (8 Cir.1980), we find no merit in the contention despite its endorsement in 6 Wigmore, Evidence § 1781, at 307 (Chadbourn rev. 1976). We prefer Judge Weinstein's view that the "verbal act" doctrine applies only when "the utterance is an operative fact which gives rise to legal consequences," *e.g.,* notice, 4 Weinstein's Evidence ¶ 801(c)[01], at 801–65 (1981).

to serve as the basis for an inference of the happening of the event which produced the state of mind." The comment, as the Notes indicate, derived from Justice Cardozo's opinion in *Shepard v. United States,* 290 U.S. 96, 98, 54 S.Ct. 22, 23, 78 L.Ed. 196 (1933), where the Government had attempted to use the state of mind exception to justify the admission of a declaration by the defendant's wife that "Dr. Shepard has poisoned me." In repelling this the Court said:

> It [the Government] did not use the declarations by Mrs. Shepard to prove her present thoughts and feelings, or even her thoughts and feelings in times past. It used the declarations as proof of an act committed by some one else, as evidence that she was dying of poison given by her husband.
>
> . . . .
>
> The testimony now questioned faced backward and not forward. . . . What is even more important, it spoke to a past act, and more than that, to an act by some one not the speaker.

*Id.* at 104, 106, 54 S.Ct. at 25, 26. DiMaria's statement had none of these characteristics. It stated, or so the jury could find, that his existing state of mind was to possess bootleg cigarettes, not stolen cigarettes. It was not offered to prove that the cigarettes were not stolen cigarettes but only to show that DiMaria did not think they were. It would defy reality to predicate any contrary conclusion on the use of the words "I came" rather than "I am". DiMaria's remark was not a statement, like Mrs. Shepard's, of what he or someone else had done in the past. It was a statement of what he was thinking in the present. *See, e.g., United States v. Zito,* 467 F.2d 1401, 1404 & n. 4 (2 Cir.1973); *United States v. Partyka,* 561 F.2d 118, 125 (8 Cir.1977), *cert. denied,* 434 U.S. 1037, 98 S.Ct. 773, 54 L.Ed.2d 785 (1978). The trial judge initially recognized this, before being distracted by the Government's erroneous reliance on *Marin,* when he said "this statement goes directly to the 659 count, and his state of mind", App. at 302.

The Assistant United States Attorney also stated in objection that DiMaria's remark was "an absolutely classic false exculpatory statement", App. at 302. False it may well have been but if it fell within Rule 803(3), as it clearly did if the words of that Rule are read to mean what they say, its truth or falsity was for the jury to determine. Dean Wigmore strongly endorsed the admissibility of such a statement at common law, 6 Wigmore, Evidence § 1732, at 159–62 (Chadbourn rev. 1976). Dealing with the argument that declarations of a mental state by an accused could readily be trumped up, he protested "the singular fallacy ... of taking the possible trickery of guilty persons as a ground for excluding evidence in favor of a person not yet proved guilty", *id.* at 160, and contended that to sustain the argument would be inconsistent with the presumption of innocence.

It is true that Dean Wigmore would permit the exclusion of a statement of existing state of mind if "the circumstances indicate plainly a motive to deceive", *id.* (footnote omitted). McCormick, Evidence § 294, at 695 n. 56 (Cleary 2d ed. 1972), cited two cases, *Elmer v. Fessenden,* 151 Mass. 359, 24 N.E. 208 (1889), and *Hall v. American Friends Service Committee, Inc.,* 74 Wash.2d 467, 445 P.2d 616 (1968), *overruled on other grounds, McGugart v. Brumback,* 77 Wash.2d 441, 463 P.2d 140 (1969), which required that, in applying the state of mind exception, there be " 'no apparent motive for misstatement' " or " 'circumstantial probability' " of trustworthiness, and another, *Smith v. Smith,* 364 Pa. 1, 70 A.2d 630 (1950), which held that the self-serving nature of such a declaration went only to its weight. The Federal Rules of Evidence have opted for the latter view. The Advisers' Introductory Note: The Hearsay Problem, endorses Professor Chadbourn's criticism of § 63(4)(c) of the Commissioners' proposed Uniform Rules of Evidence, saying, "For a judge to exclude evidence because he does not believe it has been described as 'altogether atypical, extraordinary' ", citing Chadbourn, *Bentham and the Hearsay Rule—A Benthamic View of Rule*

*63(4)(c) of the Uniform Rules of Evidence,* 75 Harv.L.Rev. 932, 947 (1962).[5]

It is doubtless true that all the hearsay exceptions in Rules 803 and 804 rest on a belief that declarations of the sort there described have "some particular assurance of credibility." See Introductory Note, *supra.* But the scheme of the Rules is to determine that issue by categories; if a declaration comes within a category defined as an exception, the declaration is admissible without any preliminary finding of probable credibility by the judge, save for the "catch-all" exceptions of Rules 803(24) and 804(b)(5) and the business records exception of Rule 803(6) ("unless the source of information or the method or circumstance of preparation indicate lack of trustworthiness"). As Judge Weinstein has stated, "the scheme adopted for the hearsay article in the federal rules is that of a system of class exceptions coupled with an open-ended provision in Rules 803(24) and 804(b)(5), and with the exemption of certain prior statements from the definition of hearsay", 4 Weinstein's Evidence ¶ 800[02], at 800–13 (1981), even though this excludes certain hearsay statements with a high degree of trustworthiness and admits certain statements with a low one. This evil was doubtless thought preferable to requiring preliminary determinations of the judge with respect to trustworthiness, with attendant possibilities of delay, prejudgment and encroachment on the province of the jury.[6] There is a peculiarly strong case for admitting statements like DiMaria's, however suspect, when the Government is relying on

the presumption of guilty knowledge arising from a defendant's possession of the fruits of a crime recently after its commission.

The Government argues that if exclusion of the statement was erroneous, the error was harmless because of the strength of the evidence against DiMaria, the ambiguous nature of the statement, the doubt that the jury would credit it, and the fact that counsel was allowed to argue that DiMaria was only trying to buy some cigarettes cheap and did not know they were stolen. The evidence with respect to guilty knowledge, while entirely sufficient, was not overpowering. As indicated above, the interpretation and the credibility of DiMaria's statement were for the jury. Counsel's argument was no substitute for the argument that could have been made if DiMaria's statement had been admitted. As we have often remarked, we cannot but wonder why, if the statement was so insignificant as the Government now claims, the prosecutor was at such pains to have it excluded.

The judgment of conviction is reversed and the cause is remanded for a new trial consistent with this opinion.

MANSFIELD, Circuit Judge (dissenting):

I respectfully dissent. As the majority recognizes (Opin. p. 270), DiMaria's statement upon arrest that he "came . . . to get some cigarettes real cheap" is ambiguous, since the term "real cheap" could refer either to "bootleg" (i.e., lower-taxed) or to

---

**5.** Professor Chadbourn added:

> In terms of the time honored formula, credibility is a matter of fact for the jury, not a matter of law for the judge.

**6.** The offer of declarations *against* a criminal defendant is a quite different matter since this implicates the Confrontation Clause of the Sixth Amendment, see *Ohio v. Roberts,* 448 U.S. 56, 100 S.Ct. 2531, 65 L.Ed.2d 597 (1980); *United States v. Puco,* 476 F.2d 1099, 1102–05 (2 Cir.), *cert. denied,* 414 U.S. 844, 94 S.Ct. 106, 38 L.Ed.2d 82 (1973). As a result, the Supreme Court has prescribed a more exacting standard by which to judge the admissibility of hearsay declarations under these circumstances:

> [W]hen a hearsay declarant is not present for cross-examination at trial, the Confrontation

Clause normally requires a showing that he was unavailable. Even then, his statement is admissible only if it bears adequate "indicia of reliability." Reliability can be inferred without more in a case where evidence falls within a firmly rooted hearsay exception. In other cases, the evidence must be excluded, at least absent a showing of particularized guarantees of trustworthiness.

*Ohio v. Roberts, supra,* 448 U.S. at 66, 100 S.Ct. at (footnote omitted). However, the Confrontation Clause is not implicated where the accused seeks to introduce hearsay declarations as part of his defense—the situation in this case.

stolen cigarettes. It would be of defensive use only if it meant the former, in which event to admit the self-serving statement without exposure to the crucible of cross-examination would in my view not only introduce an element of confusion but violate the spirit of the Hearsay Rule. However, although no guarantee of trustworthiness for the defendant's interpretation is offered, I am persuaded by Judge Friendly's customary careful and thorough analysis that the Federal Rules of Evidence required its admission.

Where I part company with my colleagues is in the appraisal of the seriousness of the error. In my view, when one examines the obviously weak nature of the statement in the light of the powerful case against DiMaria, the error was harmless. The test to determine whether non-constitutional error is harmless is "what effect the error had or reasonably may be taken to have had upon the jury's decision." *Kotteakos v. United States,* 328 U.S. 750, 764, 66 S.Ct. 1239, 1247, 90 L.Ed. 1557 (1946); *United States v. Frank,* 494 F.2d 145, 161 n. 19 (2d Cir.1974). In my view no reasonable juror would be swayed by the excluded statement to acquit.

The evidence against DiMaria was extremely strong. It is undisputed that, following the hijacking on the New Jersey Turnpike of the tractor-trailer loaded with 950 cases of cigarettes, each containing 12,000 cigarettes, and the secret storage of the truck in Jersey City, Anthony Billeci and Irving Birnbaum, with knowledge that the truckload had been hijacked, met repeatedly with DiMaria outside a Brooklyn social club on the evenings of February 17 and 18, 1981, where the three had furtive conversations on the street in cold weather. On the following day Billeci and Birnbaum supervised the transfer of the stolen goods from New Jersey to the Terminal Market yard in Brooklyn, taking the precaution of a midtrip switch of truck drivers. The stolen cargo was followed by an Oldsmobile that had been near the Brooklyn social club at the time of their discussions with DiMaria on the previous two evenings.

On February 20 an "S & R" rental van entered the Terminal Market yard, where the cigarettes were being guarded by Miciotta, a friend of DiMaria, and took delivery of 50 cases of the stolen cigarettes, or a total of 600,000 cigarettes. On February 21 DiMaria arrived in his Cadillac, followed by a "Barn" rental van. DiMaria then directed the loading of 45 cases (540,000) cigarettes into the van, took delivery of one broken case in his own Cadillac, and started to drive off with Miciotta when both were arrested. A tally sheet on Miciotta's person showed that 50 cases had been offloaded on the previous day for "Rich" (Richard Lustparten)[1] and "Lenny" (Leonard DiMaria). Miciotta also had on his person the keys to the doors of the two IRL trailers containing the stolen cigarettes and part of the bill of lading listing the contents of the original trailer when it left Philip Morris in Richmond.

The exposed packages of cigarettes in the split case transferred from the trailers to the back seat of DiMaria's Cadillac just before his arrest did not bear the tax stamp of a low-tax state (e.g., North Carolina), which would have lent some support to a claim that they were "bootleg", but instead bore no tax stamps at all. According to Special Agent Brederhoft all continental states require tax stamps and the absence of any stamps at all is strong evidence that the cigarettes either are in transit from a manufacturer (in this case Philip Morris) or have been stolen. "Bootleg" cigarettes are found only in much smaller quantities than those seized here.

In light of the foregoing evidence, even if DiMaria had clearly stated that "I didn't know the cigarettes were stolen" or "I only came to buy one case," no jury would have believed his remarks. The furtiveness of DiMaria's conversations in the cold on two evenings outside the social club with the

---

1. The "S & R" van into which the 50 cases were loaded had been rented by Richard Lust- parten.

two stolen-goods entrepreneurs (Billeci and Birnbaum), viewed in the light of events that followed, demonstrates that he was negotiating for the purchase of a large quantity of stolen goods; one does not engage in such protracted discussions merely to buy a few packs of cigarettes. The delivery of 50 cases of the stolen goods to the "S & R" truck for "Lenny and Rich" on February 20 confirms that DiMaria was purchasing numerous cases, not just a few cigarettes. Finally, DiMaria's arrival on February 21st with a van and his direction of the offloading of the cases from the trailers into the van leaves no doubt whatever about the quantities involved.

As for DiMaria's knowledge of whether the cigarettes were stolen or bootleg, it strains credulity beyond the breaking point to think that that subject did not arise during the extensive negotiations and clandestine transfers. Moreover, DiMaria's possession at the time of arrest of an open case showing that the cigarettes bore no tax stamps at all thoroughly destroys his contention that he thought he was buying bootleg cigarettes bearing a lower-tax stamp. Similarly, DiMaria had ample opportunity to examine the 50 cases offloaded for "Rich and Lenny" the day before the arrest.

In short, the picture is clearly one of a person who knowingly participated in the purchase and distribution of massive quantities of stolen goods, and any self-serving statements to the contrary made by DiMaria would be quickly rejected by a reasonable jury. But DiMaria's remark is not necessarily even exculpatory. The majority suggests that the statement "could be considered by the jury as negating an intention to possess a quantity in excess of 60,000 which § 2341(2) requires for a conviction." However, without further elaboration—and DiMaria did not testify—the statement sheds absolutely no light on the issue of quantity. Indeed, DiMaria's briefs do not even raise the point made by the majority. So, too, DiMaria did not say that he thought he was buying bootlegs; his statement leaves that matter as well in a state of complete ambiguity. Although bootleg cig-

arettes may be "cheap", stolen cigarettes are even cheaper—"real cheap."

Since the undisputed evidence of DiMaria's guilty knowledge is so strong and the excluded remark has such minimal significance on that issue (indeed, might even corroborate, rather than rebut, the other evidence of guilt), I would hold that the error is harmless and affirm the judgment of conviction.