**UNITED STATES**

v.

**Ingrid ZAPATA, Defendant.**

**No. 02 CR 1545(VM).**

United States District Court, S.D. New York.

May 5, 2005.

---

Mark Alexander Racanelli, U.S. Attorney's Office—SDNY, New York, NY, for United States.

Roger Bennet Adler, Roger B. Adler, P.C., New York, NY, for Ingrid Zapata.

## DECISION AND ORDER

MARRERO, District Judge.

Defendant Ingrid Zapata ("Zapata") filed a motion for a new trial under Feder-

al Rule of Criminal Procedure 33 ("Rule 33") on March 18, 2005, after being found guilty on February 17, 2005 of participating in a narcotics conspiracy in violation of 21 U.S.C. §§ 812, 841(a)(1), 841(b)(1)(A) and 846.[1] The Government opposed the motion by letter brief dated April 18, 2005.

The Court finds that the interests of justice would not be served by upsetting the jury verdict entered against Zapata. For the reasons stated herein, the Court denies Zapata's motion for a new trial under Rule 33.

## I. BACKGROUND [2]

Evidence at trial suggested that as early as February 2002, Nestor Fabian Londono ("Londono") was dealing in the traffic of narcotics. A number of associates assisted Londono in running his narcotics business: Steven Cuevas ("Cuevas") was recruited in the Summer of 2002 to work for Londono as his chauffeur; Pedro Duran Londono ("Duran") introduced Londono to a drug supplier in Colombia and accompanied Cuevas to Florida to pick up drugs; and Oscar Ceballos ("Ceballos") ran his own narcotics operation and lent Londono narcotics and money when Londono needed them. Londono's operation brought kilogram quantities of heroin into New York for distribution and sale.

Zapata met Londono in October of 2002 when he began dating her cousin, Carolina Rios ("Rios"), also known as "Marilyn Ortega." Zapata lived with Rios at that time in Rios's apartment in Queens. Zapata and Rios would socialize at nightclubs and at Rios's apartment with Londono, Duran, Cuevas and Ceballos, with whom Zapata allegedly became romantically involved. On these social occasions, Londono would spend large amounts of cash, sometimes over a thousand dollars in an evening. Rios testified that she overheard Londono discuss "trabajo," or "work," with Duran and Cuevas while they were socializing in her apartment, and that she understood this phrase to refer to their drug business.

Eventually, Londono asked Rios and Zapata to do "favors" for him. In one instance, he requested that Rios fly to Florida to meet a man with a suitcase and to hold the suitcase in a hotel in Florida where Cuevas and Duran would retrieve it from her. On another occasion, Londono asked Zapata to fly to Florida with several thousand dollars which she was to give to Cuevas. On November 26, 2002, Londono had Zapata and Rios wire approximately $2,000 in two payments of under $1,000 each to Cuevas and Duran in Florida. Although hard copies of the forms used to send these payments were not presented at trial, the Government produced documents from the central Western Union computer database (the "Western Union records") which were admitted, over Zapata's objection, for the limited purpose of showing that someone using the names "Ingrid Zapata" and "Marilyn Ortega" wired the money to Cuevas and Duran at the times and places indicated.

Finally, on November 27, 2002, Londono asked Zapata and Rios to fly to Florida to give money to an individual there. Rios testified that Londono told her that the money was to pay for drugs that were being held by Londono's "only client."

---

**1.** On the last day of the trial, February 17, 2005, the Court granted Zapata until March 18, 2005 to file a post-verdict motion to set aside the verdict. (Tr. at 1112.)

**2.** Additional factual background concerning this case can be found in the Court's previous decisions in this matter. *See United States v. Zapata*, 357 F.Supp.2d 667 (S.D.N.Y.2005); *United States v. Zapata*, 356 F.Supp.2d 323 (S.D.N.Y.2005).

Londono rolled $8,500 in several eyeglass cases in Rios's purse and gave Zapata $8,000, which she put in her wallet. Londono bought them two plane tickets, one in Zapata's name and one in the name of Rios's alias, Marilyn Ortega. Zapata and Rios flew the money to Florida, and met with a gentleman named "El Gordo" at approximately ten o'clock in the evening on the street to give him the $16,500. Zapata and Rios flew back to New York City the next day.

When Zapata and Rios landed at LaGuardia Airport, they were approached by federal agents and placed under arrest. Rios and Zapata were separated and seated in an empty passenger lounge. The agents questioned Rios, who identified herself as Marilyn Ortega and acknowledged that she and Zapata had just delivered money in Florida for a drug transaction, but did not question Zapata. In the holding cells at LaGuardia, Rios told Zapata "that the money was to buy an apartment." (Tr. at 590.) Zapata was questioned early the next morning at Drug Enforcement Agency ("DEA") headquarters by a Spanish-speaking officer. Zapata stated that she was given $8,000 by "Marilyn Ortega" to fly to Florida for the purpose of purchasing an apartment for Londono. Rios, when questioned at DEA headquarters, changed her story and also stated that the purpose of the trip was to purchase an apartment.

Zapata maintained at trial that her understanding of the purpose of the trip was to purchase real estate and that she was unaware that Londono was a drug dealer. She said that she did not know that the purpose of her trips to Florida were related to the purchase or sale of narcotics. With respect to her first flight to Florida, she stated that she flew there primarily to retrieve her winter clothing from her mother's house, and did Londono the favor of flying the money he asked her to carry to Cuevas.

On February 17, 2005, a jury found Zapata guilty of conspiracy to distribute and possess with intent to distribute one kilogram and more of heroin. The jury found that one kilogram or more of heroin was involved in the conspiracy. Zapata has moved for the Court to overturn this verdict and to grant a new trial under Rule 33 in the interests of justice.

## II. STANDARD OF REVIEW

■ Under Rule 33, a motion for a new trial may be granted "if the interests of justice so require." Fed.R.Crim.P. 33. Rule 33 "gives the trial court 'broad discretion . . . to set aside a jury verdict and order a new trial to avert a perceived miscarriage of justice.' " *United States v. Ferguson*, 246 F.3d 129, 133 (2d Cir.2001) (quoting *United States v. Sanchez*, 969 F.2d 1409, 1413 (2d Cir.1992)). A defendant who makes such a motion has the burden of proving the necessity for a new trial. *See United States v. Ferguson*, 49 F.Supp.2d 321, 323 (S.D.N.Y.1999) (citing *United States v. Soblen*, 203 F.Supp. 542 (S.D.N.Y.1961)). In considering a Rule 33 motion, a district court must strike a balance between weighing the evidence and credibility of witnesses and not "wholly usurping" the role of the jury. *United States v. Autuori*, 212 F.3d 105, 120 (2d Cir.2000).

■ Because a court generally must defer to the jury's resolution of conflicting evidence and assessment of witness credibility, "[i]t is only where exceptional circumstances can be demonstrated" that a trial judge may intrude upon a jury's factual determinations. *Sanchez*, 969 F.2d at 1414. One example of an exceptional circumstance is when testimony is "patently incredible or defies physical realities," although a district court's rejection of partic-

ular trial testimony by itself does not automatically warrant a new trial under Rule 33. *Ferguson*, 246 F.3d at 134.

■ Generally, a trial court has broader discretion to grant a new trial under Rule 33 than to grant a motion for acquittal under Federal Rule of Criminal Procedure 29 ("Rule 29"). For example, the Court is not required to view the evidence in the light most favorable to the Government, unlike its role under the standard governing a Rule 29 motion. *See Ferguson*, 49 F.Supp.2d at 323 (citing *United States v. Lincoln*, 630 F.2d 1313, 1319 (8th Cir. 1980)). A trial court must be satisfied that "competent, satisfactory and sufficient evidence" in the record supports the jury verdict. *Ferguson*, 246 F.3d at 134. Nonetheless, a trial court must exercise its Rule 33 authority "sparingly" and in "the most extraordinary circumstances." *Sanchez*, 969 F.2d at 1414. The ultimate test on a Rule 33 motion is "whether letting a guilty verdict stand would be a manifest injustice." *Ferguson*, 246 F.3d at 134 (citing *Sanchez*, 969 F.2d at 1414). Before a Court grants a motion for a new trial under Rule 33, "[t]here must be a real concern that an innocent person may have been convicted." *Id.*

### III. DISCUSSION

Many of the issues raised by Zapata in her Rule 33 motion were addressed thoroughly by the Court both on the record and in its earlier decisions in this case. *See United States v. Zapata*, 357 F.Supp.2d 667 (S.D.N.Y.2005) ("*Zapata II*") (denying Zapata's motions to admit the plea allocution of Londono, to preclude the inclusion of a conscious avoidance charge, and to excise language from the jury charge relating to her liability for the quantity of drugs involved in the transaction); *United States v. Zapata*, 356 F.Supp.2d 323 (S.D.N.Y.2005) ("*Zapata*

*I*") (granting the Government's motion to exclude the proffered post-arrest statement made by Londono, and granting in part and denying in part Zapata's motion to preclude the admission of the Western Union records). Zapata has set forth no basis for the Court to revisit its prior rulings, as her motion merely reiterates the arguments that the Court previously found unpersuasive as to the law and on the facts. The Court will specifically address only those issues raised in Zapata's Rule 33 motion that were not thoroughly addressed in the Court's prior decisions.

### A. TESTIMONY OF LONDONO

In its prior decisions and on the record at trial, the Court thoroughly addressed the admissibility of the various statements made by Londono concerning Zapata. *See Zapata II*, 357 F.Supp.2d at 668–70 (admissibility of Londono's plea allocution); *Zapata I*, 356 F.Supp.2d at 326–28 (admissibility of Londono's post-arrest statement); (Tr. at 941–46.) The Court reiterates its prior rulings concerning the inadmissibility of both of these statements.

■ Zapata raises two issues concerning Londono's statements that the Court will address. First, Londono did not waive his Fifth Amendment privilege against self-incrimination when he pleaded guilty to the narcotics conspiracy at issue in this case because he had not yet been sentenced by the Court at the time Zapata requested his testimony at her trial. (Tr. at 941–42); *see Mitchell v. United States*, 526 U.S. 314, 325, 326–27, 119 S.Ct. 1307, 143 L.Ed.2d 424 (1999) (holding that the privilege against self-incrimination survives a plea of guilty and continues until sentence is imposed). Additionally, Londono's claim of the privilege was valid, as he may have made injurious disclosures if not on direct examination, then perhaps on

cross, which might have negatively affected his sentence or exposed him to further prosecution. *See United States v. Lumpkin,* 192 F.3d 280, 285–86 (2d Cir.1999) (upholding a witness's invocation of her privilege against self-incrimination even after she had pleaded guilty to the crimes about which she would testify because the court found it "entirely foreseeable that in responding to further questions, on cross if not direct, [the witness] would have contradicted other aspects of her plea colloquy or made further admissions and, in so doing, would have been liable for a perjury charge or other federal or state prosecution").

 Second, Londono's statements would not have been admissible under Federal Rule of Evidence 803(3) ("Rule 803(3)"), which provides for the admission of a statement of the declarant's then existing mental, emotional or physical condition, regardless of whether the declarant is available as a witness.[3] *See* Fed.R.Evid. 803(3). This Rule is entirely inapplicable to the question of the admissibility of either Londono's plea allocution or his post-arrest statement, as neither of those statements concerned Londono's then-existing state of mind.[4] The statements are not admissible under the Rule to prove Zapata's then-existing state of mind, as she was not the declarant. *See United States v.*

*DiMaria,* 727 F.2d 265, 270–71 (2d Cir. 1984) (noting that where a statement concerns a past act performed by someone other than the speaker, the statement cannot be admitted under Rule 803(3), quoting *Shepard v. United States,* 290 U.S. 96, 98, 54 S.Ct. 22, 78 L.Ed. 196 (1933)). Additionally, the rule does not apply where the statement concerns the memory or belief of the declarant. *See* Fed.R.Evid. 803(3) advisory committee's note ("The exclusion of 'statements of memory or belief to prove the fact remembered or believed' is necessary to avoid the virtual destruction of the hearsay rule which would otherwise result from allowing state of mind, provable by a hearsay statement, to serve as the basis for an inference of the happening of the event which produced the state of mind."); *DiMaria,* 727 F.2d at 270–71. Both of the proffered statements made by Londono concern his memories of events, not his existing state of mind. For these reasons, the exclusion of Londono's statements does not constitute error, nor does it warrant the granting of a new trial to Zapata.

## B. WESTERN UNION RECORDS

The Court thoroughly addressed the issue of the admissibility of the Western Union records in its prior decision. *See*

---

**3.** Zapata did not raise this Rule as a basis for the admission of the statements during the trial. Zapata argued that Londono's statements were not being offered for their truth, but rather for the effect that they had on Zapata's state of mind, (*see* Tr. at 945–46). However, this basis for admission does not fall within Rule 803(3). The Court rejected Zapata's contention that these particular statements of Londono's could have had some effect on her state of mind, as the statements were not made to her or in her presence. (Tr. at 946.)

**4.** Londono's post-arrest statement, in substance, was that he was involved in the nar-

cotics business, and he also volunteered, without being asked by law enforcement agents, that Zapata and Rios were not involved in his drug business.

The portion of Londono's plea allocution that Zapata sought to admit stated: "Marilyn was my girlfriend. I asked her if she'd be kind enough to take that money to Miami for me, because I needed to have it delivered. And she did it for me, as a favor, without knowing what the money was for or anything. I never thought that I would be getting her and her cousin involved in a problem." (Londono Plea Allocution Tr., dated July 13, 2004, at 21.)

*Zapata I*, 356 F.Supp.2d at 328–31. The Western Union records were properly admitted, not for the truth that Zapata herself in fact signed the documents, but for the limited purpose of showing that the Western Union wire transfers of money occurred at the times, places and in the manner indicated, and that one of the transactions was initiated by an individual who signed the documents as "Ingrid Zapata." *See United States v. Lieberman*, 637 F.2d 95, 101 (2d Cir.1980). The jury was given a limiting instruction to consider the documents solely for that limited purpose. (Tr. at 197–98.) The Court reaffirms its earlier ruling as to the admissibility of the Western Union records, and finds no basis for granting Zapata a new trial on this ground.

## C. INTERRUPTION OF DEFENSE SUMMATION

Zapata contends that certain objections raised by the Government, which the Court sustained and which interrupted defense counsel's summation, were improper. On this point, she argues that counsel should have been allowed to comment upon the fact that (1) Rios was "getting a pass" on being prosecuted for her numerous misrepresentations to the Government, and was therefore inclined to bolster the Government's case, and (2) the Government failed to take handwriting exemplars and fingerprints of Zapata for forensic analysis. (Zapata Mem. ¶¶ 127–29.) The Second Circuit has stated that "[a] trial judge has the discretion to regulate summations and will not be reversed absent an abuse of discretion." *Boyd v. Loeb Partners Corp.*, No. 00–7052, 2000 WL 1568223, at *1 (2d Cir. Oct.19, 2000); *see also Herring v. New York*, 422 U.S. 853, 862, 95 S.Ct. 2550, 45 L.Ed.2d 593 (1975) ("The presiding judge must be and is given great latitude in controlling the duration and limiting the scope of closing summa-

tions.... He may ensure that argument does not stray unduly from the mark, or otherwise impede the fair and orderly conduct of the trial. In all these respects he must have broad discretion.").

■ The interruptions to defense counsel's summation cited by Zapata were justified and do not constitute error warranting the granting of a new trial to Zapata. Several of the Government's objections to defense counsel's summation concerned defense counsel's reference to facts that the Court determined were not in evidence or not relevant to the matters on trial. (*See* Tr. at 1005 (referring to Government witnesses Cuevas and Rios, "They have avoided prosecution for the full brunt of their criminal conduct and most importantly you know that they will not be charged with making false statements"); Tr. at 1006 ("it probably would be news to Martha Stewart to know the treatment that Carolina Rios has gotten to that compared to that [sic] of Martha Stewart"); Tr. at 1010 ("Guideline range 70 to 87 months, but [Rios] is not going to do that kind of time.").) The Court properly sustained these objections, as statements based on evidence that was not presented at trial or commenting on collateral issues unrelated to the trial should not be made in summation. *See United States v. Schafrick*, 871 F.2d 300, 305 (2d Cir.1989) (finding that the making of a remark in prosecutor's summation concerning matters not in evidence was improper, but that any resulting prejudice was cured by the court instructing the jury to disregard the remark).

The Government also objected to defense counsel's remarks concerning the Government's failure to procure handwriting exemplars from Zapata or to perform fingerprint analysis on the wire transfer receipts from the transaction Zapata allegedly carried out at the store called "Pron-

to Envio". (Tr. at 1015 ("The government put all this stuff up there to substitute because why would they want to give you fingerprint analysis to see if Ingrid Zapata's fingerprints were on here or handwriting analysis by getting exemplars."); Tr. at 1020 ("The wires don't really match up, don't really corroborate, and more importantly particularly with regard to the failure to have exemplars.").) Commentary by defense counsel seeking to raise evidentiary gaps as a basis for reasonable doubt for the jury from the Government's failure to present handwriting or fingerprint analysis was properly objected to by the Government. "[T]he Government is not required to use any particular law enforcement techniques." *United States v. Sanchez Solis*, 882 F.2d 693, 697 (2d Cir. 1989). It is not the jury's province to speculate about what evidence could have been presented to it from particular law enforcement methods, and what such evidence may or may not have reasonably established. Rather, the jury must evaluate the evidence before it and what that evidence proved or did not prove. The Court finds no basis for granting Zapata a new trial under Rule 33 based on the interruptions in the defense summation occasioned by the Government's objections that were properly sustained.

## D. INCLUSION OF THE "CONSCIOUS AVOIDANCE" CHARGE

The Court thoroughly addressed the issue of the inclusion of a "Conscious Avoidance" charge in the jury instructions in its prior decision. *See Zapata II*, 357 F.Supp.2d at 670–71. The charge given in this case comports with the Second Cir-

cuit's standards for the giving of a "Conscious Avoidance" charge, as stated in *United States v. Ferrarini*, 219 F.3d 145, 154–57 (2d Cir.2000). (*See* Tr. at 1084–85.) The Court reaffirms its earlier ruling as to the propriety of the inclusion of the "Conscious Avoidance" charge, and finds no basis for granting Zapata a new trial on this ground.

## E. ALLEGED BREACH BY THE GOVERNMENT OF ITS *BRADY* AND *GIGLIO* OBLIGATIONS

■ Zapata claims that the Government's failure to turn over certain documents located in Rios's Pretrial Services file, which Zapata obtained from the public court file,[5] warrants the granting of a new trial because "this disclosure breach was unfairly prejudicial." (Zapata Mem. ¶ 138.) Zapata does not detail what prejudice she suffered as a result of the Government not disclosing this document to her, and appears to be asking the Court to punish the Government for not turning the document over, on the assumption that the Government was never going to reveal either the document or the information contained therein. The Court does not find this argument persuasive, as it noted on the record numerous times.

In accordance with *United States v. Moore*, 949 F.2d 68, 70–72 (2d Cir.1991), and *United States v. Pena*, 227 F.3d 23, 26–28 & n. 3 (2d Cir.2000), because the Government acknowledged that it was aware of the information contained in the Pretrial Services documents produced by Zapata, (*see* Tr. at 266), it had an obligation to disclose the impeachment information contained therein to Zapata.[6]

---

**5.** The documents were mistakenly filed in the public file. The Court ordered that the confidential documents be removed once their presence in the public file was brought to its attention.

**6.** Although the Government expressed to the Court that it knew about the document and the information contained therein, the Government explained that, in accordance with Pretrial Services procedure, it had to give the

However, the Government could not, due to the confidentiality restrictions on Pretrial Services records, simply disclose any and all information that it had with respect to Rios's Pretrial Services file. "[W]hen a defendant requests that the government disclose pretrial services materials pursuant to its discovery obligations to provide defense counsel with exculpatory and impeachment information in its possession, district judges should review those materials *in camera* and determine whether they contain such information. If so, and if there is a compelling need for its disclosure, the district court should, to the extent possible, turn over only that portion of the document containing such information." *Pena*, 227 F.3d at 28.

Zapata's counsel brought the offending document to the Court's attention on the first day of trial, (*see* Tr. at 19–25), after having reviewed it over the weekend. The Court brought to the parties' attention the *Pena* decision and the procedure the Second Circuit there outlined. (Tr. at 36.) The Court, in accordance with *Pena*, reviewed Rios's Pretrial Services file and disclosed any proper *Giglio* material it found. (*See* Tr. at 264–65.) The information contained in the document Zapata had previously discovered, which concerned Rios's violation of the conditions of her bail, were brought out by the Government on direct examination. (Tr. at 521–22.) Defense counsel questioned Rios extensively about the information contained in

the Pretrial Services documents, in this connection using both the document that Zapata found in the public file and those produced by the Court after its *in camera* inspection. (Tr. at 627–47, 650–56.)

The Second Circuit stated in *In re United States*, 267 F.3d 132 (2d Cir.2001), that "[t]here is no *Brady* [*v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963)] violation unless there is a reasonable probability that earlier disclosure of the evidence would have produced a different result at trial." *Id.* at 144; *see also United States v. Dessange*, No. 99 Cr. 1182, 2000 WL 280050, at *9 (S.D.N.Y. 2000) ("*Giglio* [*v. United States*, 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972)] material is customarily produced in this District with Section 3500 material in recognition of the fact that this type of *Brady* material does not ordinarily require any independent investigation in order to use it effectively at trial."); *United States v. Frank*, 11 F.Supp.2d 322, 325 (S.D.N.Y. 1998) (noting that courts have approved the disclosure of *Giglio* material as late as the day that the witness testifies).

Even if the Court were to find that the Government's failure to disclose Rios's Pretrial Services documents constituted a violation of the Government's *Brady* and *Giglio* obligations, which it does not, the Court cannot say that a disclosure of the material at an earlier stage in the proceedings would have averted any of the unspec-

---

document back to Pretrial Services at the conclusion of Rios's bail hearing and represented that it did not maintain any copies of the document in its records. (Tr. at 266.) The bail hearing occurred over a year prior to the trial in this case, long before any defendants had pleaded guilty or before the Government knew of Zapata's intent to go to trial, and the Government's obligation to disclose the information arose only with the pendency of Zapata's trial and the Government's knowledge that Rios would testify as a witness for

the Government at that trial. *See In re United States*, 267 F.3d 132, 144 (2d Cir.2001); *United States v. Frank*, 11 F.Supp.2d 322, 325 (S.D.N.Y.1998). The Government explained that it had anticipated bringing the information contained in the document out on direct examination. (*Id.*) The Court finds no evidence of bad faith on the part of the Government in failing to disclose the document or the information contained therein prior to the start of trial.

ified prejudice Zapata asserts or produced a different result at trial. Zapata was able to thoroughly question Rios as to the information contained in the documents, and the Court can find no prejudice that Zapata suffered as a result of the timing of the disclosure of the Pretrial Services material in this case. The Court concludes that there is no basis for a reversal of the judgment of conviction against Zapata on this ground.

## F. ADMISSION OF DOCUMENTS FROM ZAPATA'S PRETRIAL SERVICES FILE

The Court addressed the issue of the admissibility of certain documents from Zapata's Pretrial Services file, which were identified as impeachment material by the Court after an *in camera* inspection of the file, on the record during Zapata's trial. (*See* Tr. at 815–17.) The Second Circuit, in *United States v. Griffith*, 385 F.3d 124 (2d Cir.2004), considered the issue of "whether, under 18 U.S.C. § 3153, information obtained from the defendant during a pretrial-services interview may be used against him for impeachment purposes," *id.* at 125, and held that "a defendant's statements to pretrial services are admissible against the defendant when used to impeach the defendant's credibility." *Id.* at 126. The Second Circuit based this holding on its interpretation of 18 U.S.C. §§ 3153(c)(1) and (c)(3), which state, in pertinent part:

> (1) . . . *information* obtained in the course of performing pretrial services functions in relation to a particular accused shall be used only for the purposes of a bail determination and shall otherwise be confidential.
>
> . . . .

(3) Information made confidential under paragraph (1) of this subsection is not admissible on the issue of guilt in a criminal proceeding.

*Id.* (emphasis added). Although the court in *Griffith* considered the admissibility of *statements* made to a Pretrial Services officer,[7] this Court found that the holding encompassed all "information" in a Pretrial Services file, including documents recording a defendant's signature, that would be relevant for impeachment purposes. (*See* Tr. at 813–14, 815–17.)

On direct examination, Zapata was asked whether or not her signature and handwriting were on two wire transfer records from a "Pronto Envio" store (the "Pronto Envio records"). (*See* Tr. at 801.) Zapata stated that the signature on one of the Pronto Envio records, which read "Ingrid Zapata," was not hers and that her handwriting did not appear on either of the two money transfer slips. (*Id.*) Zapata thus placed in issue the identity of the handwriting on the Pronto Envio records. Accordingly, the Government was allowed on cross-examination to impeach her testimony by confronting her with and questioning her about the documents located and released by the Court after its *in camera* inspection of Zapata's Pretrial Services file. Those documents had undisputed signatures of Zapata's on them, which, the Government suggested, were similar to the one on the Pronto Envio records that Zapata denied was hers. The Court reaffirms its previous ruling on this issue and denies Zapata's motion for a new trial on this basis.

## IV. CONCLUSION

The Court does not find that any of the six grounds cited by Zapata warrant over-

---

7. It is not clear from the recitation of the facts in the *Griffith* decision whether the statements at issue in that case were made orally or in written form by the defendant to the Pretrial Services officer.

turning the jury's verdict in this case. Furthermore, the Court can identify no other ground upon which to grant Zapata a new trial, as the Court cannot conclude that "manifest injustice" was committed in Zapata's conviction. The Court is satisfied that "competent, satisfactory and sufficient evidence" in the record supports the jury verdict. Therefore, the Court denies Zapata's motion for a new trial under Rule 33.

## V. ORDER

For the reasons stated above, it is hereby

**ORDERED** that the motion of defendant, Ingrid Zapata, for a new trial under Federal Rule of Criminal Procedure 33 is DENIED.

**SO ORDERED.**