COURT
OF APPEALS

                                       SECOND
DISTRICT OF TEXAS

                                                   FORT
WORTH

 

 

                                        NO.
2-05-063-CR

 

 

LANCE RAYSHAWN KIRK A/K/A LANCE KIRK                           APPELLANT

 

                                                   V.

 

THE STATE OF TEXAS                                                                STATE

 

                                              ------------

 

           FROM
THE 372ND DISTRICT COURT OF TARRANT COUNTY

 

                                              ------------

 

                                             OPINION

 

                                              ------------








Appellant Lance Rayshawn Kirk
appeals his conviction for capital murder. 
The jury found Appellant guilty, and because the State waived the death
penalty, the trial court sentenced Appellant to the statutory requirement of
life imprisonment.  See Tex. Code Crim. Proc. Ann. art. 37.071
(Vernon Supp. 2005).  In seven points,
Appellant contends that the trial court erred by failing to appoint a second
attorney to represent him, by overruling the motion to suppress one of
Appellant=s statements
to the police, by failing to give properly requested limiting instructions, by
admitting hearsay statements, and by excluding statements relative to Appellant=s state of mind.  He also
asserts that his trial counsel was ineffective because he failed to immediately
ask for a death-qualified lead attorney and failed to object to the admission
of Appellant=s statement
because of the trial court=s failure to appoint a second attorney to represent Appellant.  We affirm. 

FACTUAL BACKGROUND

On Wednesday, May 28, 2003,
Appellant ran a stop sign driving a silver Infiniti.  Officer Myers, a patrol officer with the Fort
Worth police department, stopped Appellant for the traffic violation.  Officer Myers entered the license number of
the vehicle into his on-board computer before approaching Appellant, who was
alone in the car.  Appellant informed
Officer Myers that he did not have his driver=s license or proof of insurance, but he provided Officer Myers with
his name and birth date.  He told Officer
Myers that the car belonged to his aunt. 
Appellant informed Officer Myers that he was not in school because he
had just gotten out of teen court. 
Officer Myers went back to the vehicle to verify the information that
Appellant had provided, but when he reached his patrol car, he saw that the
computer screen indicated that the Infiniti was wanted in connection with a
homicide.








Officer Myers radioed for
assistance in making the arrest and returned to Appellant, told Appellant he
was going to write him some tickets for failing to have his driver=s license and proof of insurance, and asked Appellant to wait in the
backseat of the patrol car.  When Officer
Stephens arrived, Officer Myers advised Appellant that he was placing him under
arrest.  Appellant jumped out of the car
and slammed Officer Myers to the ground with enough force to knock him
unconscious.  Appellant was apprehended
running through a neighborhood and was arrested for running from the police and
injuring the two officers.

The silver Infiniti belonged
to Robert and Joan Griswold.  Officers
had found the Griswolds dead in their home on May 27, 2003.  The officers had responded to a welfare check
at the Griswold home after Joan Griswold failed to come into work and her
coworkers were unable to contact her. 
Officers found Robert Griswold=s body lying on the dining room floor. 
He had been shot twice.  Officers
found Joan Griswold=s body lying
face down in the hallway. She had been shot in the back of the head once at
very close range.








The evidence presented at
trial showed that Appellant and Quntione AMontrel@ Solomon
spent the afternoon of May 24, 2003, at Appellant=s mother=s
house.  Appellant=s mother was not there, and Appellant did not have keys to his mother=s house, so the pair used a ladder to enter the house through a second
story window.  While there, they showered
and played video games.  Appellant
informed Montrel that he was going to Aborrow a truck@ and left
Montrel at the house alone.  While
Appellant was out, Montrel called his brother two times asking whether he had
heard from Appellant.

Around 5:00 p.m. on Saturday,
Appellant called his girlfriend, Jennifer Page. 
During the conversation, he informed Page that he was going to buy a
car.  Although Appellant had mentioned
getting an older car, Page knew that Appellant did not have a job and depended
on his mother for money.

Sometime between 4:30 and
5:30 that afternoon, Carla Sams answered the doorbell at her house in the
Candleridge neighborhood of Fort Worth, and Appellant was standing
outside.  He asked her whether Casey
stayed there. Sams noticed that as Appellant spoke, he leaned to the side to
peer into the house a couple of times. 
She informed him that there was no one that lived there by that name,
and she shut the door.  She testified
that she had not seen a car parked in the street behind Appellant, and she saw
him walking towards Candleridge Park as he left.








That same evening Jacqueline
Davis, her husband, and a neighbor finished unloading a heavy outdoor grill
that they had just purchased.  Davis= parents= house was
just a short walk up a back alley from her house, right next door to the
Griswolds= home.  One of Davis= neighbors helped Davis and her husband unload the outdoor grill off
of the truck.  Davis escorted her
neighbor to the back gate and watched her neighbor walk down the alley to his
own backyard. As she did, she noticed a car coming down the alley, Afaster than cars usually come down that alley.@  She saw Appellant, alone,
driving a silver Infiniti down the alley.

Montrel testified that
Appellant returned to his mother=s house around sunset driving a silver Infiniti.  He also had a cellular telephone and credit
cards. Montrel testified that one of the cards had Robert Griswold=s name on it.  When Montrel
asked Appellant how he got the car, Appellant told him that he got it from a Ahomeboy.@  Appellant drove the car to the Solomon house,
where he and Montrel picked up one of Montrel=s two brothers.  The Solomon
brothers were surprised to see Appellant driving the silver Infiniti.  Appellant told Patrick Solomon that the
Infiniti belonged to his uncle.

That evening, Saturday, May
24, 2003, Appellant drove Montrel and Kendrick Solomon to a party.  They purchased gas with the credit cards that
Appellant had obtained.  During the
night, Appellant and his friends used the recently acquired cellular telephone
that had belonged to the Griswolds. 
Appellant told Kendrick that the cellular telephone was Ahis friend=s cell
phone,@ and he allowed Kendrick to use the phone.








On May 25, 2003, Appellant
drove Montrel, Kendrick, and Wayne Kirk to the Parks Mall in the Infiniti.  At a Footlocker store, they purchased
athletic shoes, sports jerseys, shorts, and a headband using Robert Griswold=s credit card.  After shopping,
Appellant treated his friends to a meal at a nearby restaurant.  An Arlington police officer stopped Appellant
as he drove the Infiniti in Arlington, but the officer only detained Appellant
for a few minutes for the  traffic
violation.

The next day, Appellant
returned to Footlocker with his friends to buy more clothes, and he continued
to use Robert Griswold=s credit
cards throughout the weekend to buy gas, groceries, and other items.  The third time that Appellant attempted to
charge merchandise from Footlocker on Robert Griswold=s credit card, the charge was declined due to suspicious activity for
repeated charges at the same location over a number of days.

Appellant and his friends
used the Griswold=s phone
throughout the weekend as well, and even programmed it with phone numbers.  Appellant and his friends sent and received
more than five hundred thirty calls over the four days that Appellant possessed
the phone.








One evening that weekend,
Appellant threw away a large number of credit cards near a Whataburger just off
of Southeast Loop 820.  The following
Wednesday, Joan Griswold=s wallet was
found behind a business park near a Whataburger located just off Southeast Loop
820.  The wallet contained Joan Griswold=s drivers=s license,
military identification card, Sam=s Club card, and a Bank of America check card.

On Memorial Day, May 26,
2003, Appellant drove the Infiniti to the Solomons= house to attend a cookout. 
Although Appellant parked the car nearby, he moved it before his mother
arrived.  On Tuesday, May 27, 2003,
Appellant drove some friends to school and then drove himself to traffic court
to appear for an earlier traffic violation. 
After school, he gave rides to a number of his friends, including his
girlfriend Jennifer Page.  Appellant told
Page that he had bought the Infiniti for $800. 
However, when Page was riding in the Infiniti with Appellant, she
noticed that Appellant immediately backed up out of sight down the street just
as his mother drove by.  Officers
apprehended Appellant the following day.








After Appellant was arrested,
he gave three statements to police. Appellant claimed that a high school
friend, Landon Phillips, had given him the car, the credit cards, and the
cellular telephone; however, the version of how he obtained the items from
Phillips differed from statement to statement. 
The statements were inconsistent and were contradicted by witnesses,
physical evidence, and phone and credit card records.  Detective Brannan testified that Appellant
had consistently changed his story to fit the questions that he was asking and
the evidence that he confronted Appellant with.

FAILURE TO APPOINT SECOND
ATTORNEY

In his first point, Appellant
contends that the trial court erred in failing to appoint a second, death-
qualified attorney to represent him.  The
State asserts that the error, if any, was harmless. 

Appellant was arrested on May
28, 2003, and he was charged with capital murder that day.  The following day, the trial court appointed
Appellant=s trial
counsel.  On August 20, 2003, Appellant
was indicted in cause number 0891414D for the capital murders of Joan Griswald
and Robert Griswald committed during the same criminal episode.

Appellant filed a AMotion for Waiver of the Death Penalty and in the Alternative for
Second Attorney and Mitigation Specialist@ on September 22, 2004. 
Therein, Appellant noted that the charges against him had been pending
for fifteen months, and he requested that the court either order the State to
file a written waiver of the death penalty, or alternatively, appoint a second,
death-qualified attorney to represent him.








On September 27, 2004,
Appellant was indicted in the case that was eventually tried, cause number
0949990D, for the capital murder of Joan Griswald Ain the course of committing or attempting to commit the offense of
robbery.@  The State filed a written
notice of waiver of the death penalty on November 4, 2004.  On January 14, 2005, Appellant moved for the
court to adopt all of the motions filed under the initial cause number into the
second cause.  The court granted the
motion to adopt on January 19, 2005.  At
the same hearing, the trial court also considered Appellant=s motion for waiver of the death penalty.  The trial court noted that because the
prosecution had Aalways
assured@ the court and defense counsel that the death penalty would be waived
in the case, the court had not appointed a second attorney.  The court observed that Appellant=s trial counsel had always been concerned with the possibility that
the prosecutor might change his mind and pursue the death penalty without the
written document; however, based on the representations that were made by the
prosecutor, the court was not concerned with that possibility.  The trial court did not appoint a second
attorney to represent Appellant.  

Code of criminal procedure
article 26.052(e) provides that

the presiding judge of the
district court in which a capital felony case is filed shall appoint two
attorneys, at least one of whom must be qualified under this chapter, to
represent an indigent defendant as soon as practicable after charges are filed,
unless the state gives notice in writing that the state will not seek the death
penalty.








Tex. Code Crim. Proc.
Ann. art. 26.052(e) (Vernon Supp. 2005) (emphasis
added).  The trial court did not appoint
two attorneys to represent Appellant between the time he was initially indicted
and the time the State gave written notice that it would not seek the death
penalty against Appellant, which was approximately seventeen months.  During that seventeen-month time period,
Appellant stood accused of capital murder and the State had not filed a written
notice that it would not seek the death penalty, yet Appellant was represented
by a single attorney.








A failure to comply with
article 26.052 is susceptible to a harmless error analysis under rule of
appellate procedure 44.2(b).  Hughes
v. State, 24 S.W.3d 833, 838 (Tex. Crim. App.), cert. denied, 531
U.S. 980 (2000).  Although Appellant was
not represented by two attorneys during that time period, he cannot show that
the error affected his substantial rights. 
See Tex. R. App. P.
44.2(b).  His case proceeded and was
tried as though the State had waived the death penalty immediately upon filing
the capital charges against Appellant. 
Appellant acknowledges that his trial counsel filed many motions and
took other actions on his behalf, and he does not establish any specific
instances of misconduct or ineffective assistance of counsel[1]
committed by his attorney.  Additionally,
the State waived the death penalty in Appellant=s case, and it represented to the court and to Appellant=s trial counsel that it was not seeking the death penalty in this
case.  Thus, Appellant has failed to demonstrate
that the trial court=s failure to
appoint a second, death-qualified attorney has affected his substantial
rights.  Accordingly, we overrule
Appellant=s first
point. 

MOTION TO SUPPRESS

In his third point, Appellant
asserts that the trial court erred by denying his motion to suppress the
audiotaped statement Appellant gave to police, which was recorded after his
trial counsel had been appointed, but before a death-qualified lead counsel was
appointed.

1. Standard Of Review








We review a trial court=s ruling on a motion to suppress evidence under a bifurcated standard
of review.  Carmouche v. State, 10
S.W.3d 323, 327 (Tex. Crim. App. 2000); Guzman v. State, 955 S.W.2d 85,
89 (Tex. Crim. App. 1997).  In reviewing
the trial court=s decision,
we do not engage in our own factual review. 
Romero v. State, 800 S.W.2d 539, 543 (Tex. Crim. App. 1990); Best
v. State, 118 S.W.3d 857, 861 (Tex. App.CFort Worth 2003, no pet.).  The
trial judge is the sole trier of fact and judge of the credibility of the
witnesses and the weight to be given their testimony.  State v. Ross, 32 S.W.3d 853, 855
(Tex. Crim. App. 2000); State v. Ballard, 987 S.W.2d 889, 891 (Tex.
Crim. App. 1999).  Therefore, we give
almost total deference to the trial court=s rulings on (1) questions of historical fact and (2) application‑of‑law‑to‑fact
questions that turn on an evaluation of credibility and demeanor.  Johnson v. State, 68 S.W.3d 644, 652‑53
(Tex. Crim. App. 2002); State v. Ballman, 157 S.W.3d 65, 68 (Tex. App.CFort Worth 2004, pet. ref=d).  But when the trial court=s rulings do not turn on the credibility and demeanor of the
witnesses, we review de novo a trial court=s rulings on mixed questions of law and fact.  Estrada v. State, 154 S.W.3d 604, 607
(Tex. Crim. App. 2005); Johnson, 68 S.W.3d at 652‑53.

When reviewing a trial court=s ruling on a mixed question of law and fact, the court of appeals may
review de novo the trial court=s application of the law of search and seizure to the facts of the
case.  Estrada, 154 S.W.3d at
607.  We must uphold the trial court=s ruling if it is supported by the record and correct under any theory
of law applicable to the case even if the trial court gave the wrong reason for
its ruling.  Armendariz v. State,
123 S.W.3d 401, 404 (Tex. Crim. App. 2003), cert. denied, 541 U.S. 974
(2004); Ross, 32 S.W.3d at 856; Romero, 800 S.W.2d at 543.  

2. Evidence Presented








After Appellant was arrested
on May 28, 2003, Detective Curtis Brannan of the Fort Worth Police Department
met with Appellant and read him his Miranda rights.[2]  Detective Brannan asked Appellant whether he
understood those rights and if he was willing to speak with him without the
presence of an attorney.  Appellant
informed him that he was willing to speak with him without an attorney present,
and he signed the Miranda warnings form provided by Detective
Brannan.  Appellant signed a written
statement, offering an explanation for why he was found in the decedents= vehicle, stating that Landon Phillips had given him the car, as well
as the decedents= credit
cards and cellular telephone.








After checking the decedents= cellular telephone records, Detective Brannan questioned Appellant
for a second time that day, pointing out discrepancies and inaccuracies in
Appellant=s first
statement.  After Detective Brannan again
read Appellant his Miranda rights, Appellant waived those rights and
gave a second statement that Detective Brannan recorded on audiotape. After
Appellant gave his second statement, he was booked into jail.  At 8:29 p.m. that evening, Appellant appeared
before a magistrate, who advised him that he was charged with capital murder
and informed him that he had a right to appointed counsel.  Appellant requested that the court appoint
counsel to represent him, and the court appointed Appellant=s trial counsel on May 29, 2003.

Appellant=s mother, Tracey Harris, contacted Detective Brannan several times to
discuss the charges pending against her son. 
On May 30, 2003, Harris contacted Detective Brannan and informed him
that Appellant had more information and that he wanted to speak with the
detectives.  This telephone conversation
between Detective Brannan and Harris was recorded on audiotape. Detective
Brannan informed Harris that he could not initiate contact with Appellant, and
that if Appellant wanted to speak with him, he would need to initiate the
contact.  Harris informed Detective
Brannan that Appellant was attempting to contact the detective at that time.

Detective Brannan got
Appellant out of jail and brought him into the interrogation room, where he
again informed Appellant of his Miranda rights. Appellant acknowledged
that he had an attorney, but stated that he wanted to speak with Detective
Brannan.  According to Detective Brannan,
Appellant Awas very
anxious to--to talk and tell his version of why he was driving around in these
dead people=s car, and
using their cell phone and credit cards. 
He was very anxious to talk.@  At the beginning of the
interview, the following discourse occurred:








[Detective
Brannan]:  Okay, I received a call
earlier today asking, being advised by [your] mother, Ms. Harris, that you wish
to speak to us again.  Is that correct?

 

[Appellant]:  Yes sir. 

 

[Detective
Brannan]:  And, did you pass that message
on to her?

 

[Appellant]:  Yes sir.

 

[Detective
Brannan]:  To pass on to us?

 

[Appellant]:  Yes sir. 

 

[Detective
Brannan]:  And you are initiating this,
in other words you are requesting to talk to me again about this case that you
are in jail for without the presence of your attorney here.  Is that correct?

 

[Appellant]:  Yes sir. 

 

[Detective
Brannan]:  And who is your attorney that=s
been appointed to you?

 

[Appellant]:  Uh, Boone something. 

 

[Detective
Brannan]:  Okay Mr. Boone and have you
got to talk to him?

 

[Appellant]:  Yes sir.

 








Detective Brannan then gave
Appellant his Miranda warnings, and he asked Appellant to initial each
warning on a form listing the Miranda rights.  Appellant complied.  He also signed the signature line on the Miranda
form. Detective Brannan then asked Appellant what he wanted to talk about,
and Appellant responded, AI want to
talk to you about my case.@  Detective Brannan asked, AOkay what questions do you have about it?  Then I=ve got some questions for you. 
So I=ll let you
go first.  How is that?@  Appellant stated: 

All right I want to knowCI need to know how how is my bail reduction and everything.  I tried, I talked to my lawyer about it but
he had said that he was going to be out of town so it was going to take a
little while.  And about the statement I
ain=t suppose to do that and all without his presence and all of that
stuff.  So basically I want to get to the
pointCto the point that I can go on and get home to my baby.

Detective Brannan responded:

Well your attorney told you
what most any attorney would.  I don=t know what his schedule is about being in town or out of town.  Attorneys don=t like for people to talk to the police without them being present for
whatever reasons they do that.  Sometimes
we talk to witnesses.  Sometimes we talk
to suspects and people that are in custody. 
And we as the police try to hear what you have to say and then go back
and check those things out.  And that=s some of the things I want to talk to you about because you had told
me about this kid named Landon that you knew in junior high or from high school.  Is that right?








Detective Brannan then proceeded to question
Appellant regarding the incident in question, and he never discussed Appellant=s bail with him.  Detective
Brannan explained that there was no evidence that Landon Phillips, the man whom
Appellant alleged had given him the car, phone, and credit cards, Awas involved in this.@  He asked Appellant about being
stopped by the Arlington police, and he confronted Appellant about the times
the calls were made on the Griswolds= cellular telephone.  The
detective questioned Appellant about his knowledge of DNA and how far he went
into the Griswolds= home.  Appellant answered all of the detective=s questions without protest. 
The last thing that Appellant stated during the interview was, AI just want to go home.@

3. The Trial Court=s Findings Of Fact And Conclusions Of Law  

The trial court found that
Appellant was seventeen years old, but he was of sufficient sophistication to
understand and waive his rights.  The
trial court determined that Appellant was in custody when he gave the third
statement, and a magistrate advised him of his rights as required by code of
criminal procedure article 15.17.  See
Tex. Code Crim. Proc. Ann.
art. 15.17 (Vernon Supp. 2005).  The
trial court found that there was no indication that the contact was initiated
by anyone other than Appellant, with or without Harris= encouragement.  The court found
that its determination was supported by Appellant=s responses to Detective Brannan=s questions during the interview.

4.  Applicable Law








Once the Sixth Amendment
attaches, government efforts to elicit information from the accused, including
interrogation, represent Acritical
stages@ to which the Sixth Amendment applies. 
Michigan v. Jackson, 475 U.S. 625, 630, 106 S. Ct. 1404, 1408
(1986); Lemmons v. State, 75 S.W.3d 513, 520 (Tex. App.CSan Antonio 2002, pet. ref=d).  The State has the burden to
prove Appellant knowingly, intelligently, and voluntarily waived his Sixth
Amendment right to counsel.  See
Jackson, 475 U.S. at 633, 106 S. Ct. 1404; Lemmons, 75 S.W.3d at
520.  The court of criminal appeals has
recognized a two‑step process to show that an accused has waived his
previously invoked right to counsel.  Cross
v. State, 144 S.W.3d 521, 526‑27 (Tex. Crim. App. 2004). This waiver
is based on the rule established by the United States Supreme Court in Edwards
v. Arizona, 451 U.S. 477, 101 S. Ct. 1880 (1981). Cross, 144 S.W.3d
at 526‑27.  In Edwards, the
Court held that Aan accused,
. . . having expressed his desire to deal with the police only through counsel,
is not subject to further interrogation by the authorities until counsel has
been made available to him, unless the accused himself initiates further
communication, exchanges, or conversation with the police.@  Edwards, 451 U.S. at
484‑85, 101 S. Ct. at 1885. 

Although Edwards dealt
with the Fifth Amendment right to counsel, it was extended by the Court to the
context of the Sixth Amendment.  See
Jackson, 475 U.S. at 636, 106 S. Ct. at 1411 (concluding that the assertion
of the right to counsel is no less significant when the basis of the assertion
is the Sixth Amendment); see also Holloway v. State, 780 S.W.2d 787, 790
(Tex. Crim. App. 1989) (recognizing the extension of Edwards to the
Sixth Amendment context). 








In Oregon v. Bradshaw,
462 U.S. 1039, 1044‑46, 103 S. Ct. 2830, 2834‑35 (1983), the
Supreme Court clarified Edwards and established a two‑step process
to determine whether a suspect has waived his previously invoked right to
counsel.  As explained by the Court of
Criminal Appeals in Cross, the first step requires proof that the
suspect himself initiates further communication with the police after invoking
his right to counsel.  Cross, 144
S.W.3d at 527.  The second step requires
proof that, after the suspect reinitiates communication with the authorities,
the suspect validly waives the right to counsel.  Id. 
Although Cross involved the Fifth Amendment, there is no
reason this rule should not be extended to the context of the Sixth Amendment,
based on the reasoning of the Jackson Court.  Hargrove v. State, 162 S.W.3d 313, 322
(Tex. App.CFort Worth
2005, pet. ref=d); see
Jackson, 475 U.S. at 632, 106 S.Ct. at 1408‑09 (stating that the
Sixth Amendment right to counsel requires at least as much protection as the
Fifth Amendment right to counsel). 
Therefore, in the present case, the State was required to prove that
Appellant reinitiated contact after he requested appointment of counsel at his
article 15.17 hearing and that he validly waived his right to counsel.  Cross, 144 S.W.3d at 527; Hargrove,
162 S.W.3d at 322.  








Here, Appellant invoked his
right to counsel by requesting the appointment of counsel at the article 15.17
hearing that was held after formal charges were filed against him.  See Hargrove, 162 S.W.3d at 321.  As the trial court noted in its findings of
fact, Appellant then reinitiated contact with Detective Brannan by having
Harris call Detective Brannan.  When Appellant
had the opportunity to speak with Detective Brannan again, he confirmed that he
requested that his mother contact Detective Brannan and pass along the message
that he wanted to initiate a conversation with the detective.

Appellant asserts that he
merely contacted Detective Brannan because he wanted to discuss his bond and custodial
status and not the investigation as a whole. 
In Cross, the court of criminal appeals explained that the
critical inquiry is whether the suspect was interrogated before the suspect
initiated the further contact with law enforcement officials.  Cross, 144 S.W.3d at 529.  If he was not, Edwards is not
violated.  Id.  A suspect=s invocation of his right to counsel acts like a protective Edwards
bubble, insulating him from any further police‑initiated questioning.
 Id.  Only the suspect himself can burst that
bubble by both initiating communications with police and expressly waiving his
right to counsel.  Id.  Once that bubble is burst, however, Edwards
disappears, and the police are free to reinitiate any future communications
and obtain any further statements as long as each statement is voluntarily made
after the waiver of Miranda rights. 
Id.








Appellant relies upon Mays
v. State, 726 S.W.2d 937, 946 (Tex. Crim. App. 1986), cert. denied,
484 U.S. 1079 (1998) (citing Bradshaw, 462 U.S. at 2385, 103 S. Ct. at
1883) for the proposition that an accused initiates a conversation under Edwards
only by remarks which can fairly be said to represent a desire to open up a
more generalized discussion relating directly or indirectly to the
investigation.  In Bradshaw, the
Court clarified that

there are some inquiries,
such as a request for a drink of water or a request to use a telephone, that
are so routine that they cannot be fairly said to represent a desire on the
part of an accused to open up a more generalized discussion relating directly
or indirectly to the investigation.  Such
inquiries or statements, by either an accused or a police officer, relating to
routine incidents of the custodial relationship, will not generally Ainitiate@ a
conversation in the sense in which that word was used in Edwards.

Bradshaw, 462 U.S. at 1045, 103 S. Ct. at 2835.  Appellant contends that his statement to
Detective Brannan that he wanted to discuss his bail reduction is not an
inquiry that would be fairly said to represent a desire on his part to open up
a more generalized discussion relating directly or indirectly to the
investigation. 








When Detective Brannan asked
Appellant what he wanted to speak with him about, Appellant responded, AI want to talk to you about my case.@  During the third statement,
Appellant acknowledged that while making Asmall talk@ before the
interview, Detective Brannan had indicated that he wanted to show Appellant Asome pictures and things@ in order to Arun down and
check all the leads@ that
Appellant might provide.  Although
Appellant did initially only ask Detective Brannan about the bail reduction,
the context of the entire exchange suggests that Appellant did not intend to
limit the discussion to the issue of his bail reduction.  In light of Appellant=s two prior statements, wherein he attempted to diminish his
involvement in the murders, Appellant=s insistence that he wanted to Atalk about [his] case@ is a statement that can  fairly
be said to represent a desire to open up a more generalized discussion relating
directly or indirectly to the investigation. 
See Mays, 726 S.W.2d at 946.   

Thus, giving deference to the
trial court=s factual
findings, we hold that the trial court did not abuse its discretion in
determining that Appellant had initiated contact with Detective Brannan.  Because Appellant initiated the contact with
Detective Brannan, the first prong of Edwards has been satisfied.  We must next determine whether Appellant
validly waived his right to counsel.  See
Cross, 144 S.W.3d at 526-27. 








Appellant had been given his Miranda
rights prior to giving his two initial statements, and the magistrate again
read Appellant his rights at the arraignment. 
At the beginning of the interview, Detective Brannan asked Appellant, Ayou are requesting to talk to me again about this case that you are in
jail for without the presence of your attorney here.  Is that correct?@  Appellant responded
affirmatively.  Then Detective Brannan
again informed Appellant of his Miranda rights immediately before
Appellant gave him the third statement. 
Detective Brannan also gave Appellant a form that listed the Miranda
rights, and Appellant initialed next to each of the rights listed and signed
the form.

Appellant had not been deprived
of food, drink, or sleep.  Appellant
acknowledged during the interview that the officers had not promised him any
benefits for making a statement, nor had they threatened or coerced him into
participating in the interview.  Giving
due deference to the trial court=s findings of fact and viewing the totality of the circumstances, we
hold that the trial court did not abuse its discretion in finding that
Appellant voluntarily waived his rights. 
Thus, the second prong of the Edwards test was satisfied.  See Cross, 144 S.W.3d at 527.  Accordingly, we overrule Appellant=s third point.

HEARSAY 

In his fifth and sixth
points, Appellant asserts that the trial court erred by admitting hearsay
statements made by the detectives when they were taking Appellant=s statements and by denying Appellant=s request for a limiting instruction regarding those statements.  The State asserts that the detectives= statements were not hearsay because the statements were not offered
to prove the truth of the matter asserted. 









We review a trial court=s ruling to admit or exclude evidence under an abuse of discretion
standard.  Green v. State, 934
S.W.2d 92, 101‑02 (Tex. Crim. App. 1996); Montgomery v. State, 810
S.W.2d 372, 391 (Tex. Crim. App. 1991) (op. on reh=g).  If the court=s decision falls outside the Azone of reasonable disagreement,@ it has abused its discretion. 
Rankin v. State, 974 S.W.2d 707, 718 (Tex. Crim. App. 1996) (op. on
reh=g); Montgomery, 810 S.W.2d at 391.

Rule 801(d) of the Texas
Rules of Evidence provides that hearsay Ais a statement, other than one made by the declarant while testifying
at the trial or hearing, offered in evidence to prove the truth of the matter
asserted.@  Tex.
R. Evid. 801(d).  Appellant
complains of Detective Brannan=s statements, AThere is no
evidence that exists right now that Landon was involved in this,@ and, AI feel like
maybe you=ve been a
little untruthful with me.  We went out
and we picked up Landon . . . .@  He also complains of Detective
Brannan=s statement, AIf we had a
person whoCif we had a
person who was telling us that they saw you walking alone to this house.  What would you think about that . . . . If we
had a person that saw you leaving that house with that vehicle what would you
think of that?@








Prior to the trial court=s publication of the tape recorded statements to the jury, Appellant
objected to the admission of the statements on the ground that  the statements included hearsay.  Appellant also requested that the court
include an instruction stating, AIn the presentation of statements by [Appellant], please keep in mind
that words of Detective Brannan and others are not the statement of [Appellant]
and are not any evidence that the matter asserted in those words are in fact
true.@  The trial court denied his
request.  Prior to the publication of the
first tape recorded statement, the trial court instructed the jury that the
transcript of the tape was merely an aid to assist them in listening to the
tape, and if there were any differences between the tape and the transcript,
the jury was to rely solely on the tape and not what was on the
transcript.  Prior to the publication of
the second tape recorded statement to the jury, Appellant renewed his previous
objections, including his hearsay objection, and for a second time, he
requested the same jury instruction.  The
trial court gave the jury the following limiting instruction concerning the
contents of each of the tape recorded exhibits:

There is evidence before you in statements in
each of these exhibits that are made, either by Detective Brannan or Detective
Hernandez, of things that have allegedly happened.  Statements of alleged facts during the course
of the interview.

 








Any
statements made during the tape by either of those people may be considered by
you to assist you, if it does, in understanding the answers to the questions
given by the Defendant, or to understand the context of the question, but
cannot be considered by you as actual matters of fact or truth in the case . .
. . For an example only, that someone might be at a baseball game.  That is a statement made.  That cannot be considered as a fact based
upon coming from [the exhibit].  Does
everyone understand, but can be used, if at all, if it assists you at all in
understanding the question or the answers to the question?@

The jury is presumed to follow the trial court=s instructions in the manner presented. See Williams v. State,
937 S.W.2d 479, 490 (Tex. Crim. App. 1996) (jury presumed to follow court=s instructions as given in charge).

Having reviewed each of the
statements that Appellant complains of, we hold that the trial court did not
abuse its discretion in admitting the statements because they were not offered
to prove the truth of the matter asserted. 
The statements were questions that Detective Brannan asked Appellant,
and they were admitted in order to give context to Appellant=s replies.  As Appellant
acknowledged, it would have been difficult to redact the entirety of Detective
Brannan=s statements from the tape recorded statements and have Appellant=s statements still make sense to the jury.  Additionally, the trial court gave an
instruction that was more favorable than Appellant=s requested instruction. 
Accordingly, we overrule Appellant=s fifth and sixth points.  








In his seventh point,
Appellant complains that the trial court erred by excluding Appellant=s proffered testimony regarding his then existing state of mind under
rule of evidence 803(3).  Appellant
sought on cross-examination to ask Montrel about a conversation that Montrel
overheard between Appellant and an unidentified caller.  Montrel only heard Appellant=s side of the conversation. 
Outside of the jury=s presence, Montrel testified that Athe phone rang, and they started talking aboutC[Appellant] started talking, can he keep the car a little longer.@  Montrel could not specify what
else was said during the conversation. 
Appellant argued to the trial court that the statement was an exception
to the prohibition against hearsay that reflected Appellant=s then existing mental condition because it showed that he was seeking
authorization to keep the car.  The State
objected on the basis of hearsay and speculation.

This statement is hearsay
because it was offered to prove the truth of the matter assertedCthat Appellant was asking someone else if he could keep the 

Griswolds= car a little longer.  See Tex. R. Evid. 801(d).  Rule of evidence 803(3) provides an exception
to the prohibition against hearsay for

[a] statement of the
declarant=s then
existing state of mind, emotion, sensation or physical condition (such as
intent, plan, motive, design, mental feeling, pain, or bodily health), but not
including a statement of memory or belief to prove the fact remembered or
believed unless it relates to the execution, revocation, identification, or
terms of declarant=s will.








Tex. R. Evid. 803(3).  The State contends
that the statement was one of Amemory or belief to prove the fact remembered or believed@ because the statement would establish that he borrowed the car from
someone in the past.  Appellant urges
that he offered the evidence to show that he did not know that the real owner
of the car was dead.

In arguing that the statement
is admissible under rule of evidence 803(3), Appellant cites United States
v. DiMaria, 727 F.2d 265, 270-72 (2nd Cir. 1984).  In DiMaria, the appellant had stated, AI only came here to get some cigarettes real cheap.@  Id. at 270.  The court analyzed the statement under the
federal rules of evidence and determined that it was admissible, noting that
the statement Awas a
statement about what [DiMaria] was thinking in the present.@  The statement in DiMaria
is clearly an assertion of the appellant=s then existing mental state, unlike the statement in question
here.  See id.  Standing alone, as it was presented, the
statement does not clearly indicate Appellant=s state of mind at the time he made the statement.  

Here, whether the statement
is reflective of Appellant=s then existing mental state showing that he did not know that the
true owners of the car were dead is an area where reasonable minds may
differ.  In such a situation, the trial
court=s determination of admissibility must prevail.  See Montgomery, 810 S.W.2d at
391.  Accordingly, we cannot say that the
trial court abused its discretion in refusing to admit this statement.  We overrule Appellant=s seventh point. 

 








INEFFECTIVE ASSISTANCE OF
COUNSEL

In his second point,
Appellant contends that he was denied effective assistance of counsel at trial
in violation of the federal and state constitutions because counsel failed to
immediately ask the trial court to appoint a death-qualified lead
attorney.  In his fourth point, he
asserts that he was denied effective assistance of counsel because his trial
counsel failed to object to the admissibility of his third statement to police
on the basis that it was given after only one attorney had been appointed for
him, but he was also entitled to a second, death-qualified attorney.

1. Standard Of Review 

To establish ineffective
assistance of counsel, the appellant must show by a preponderance of the
evidence that his counsel=s
representation fell below the standard of prevailing professional norms and
that there is a reasonable probability that, but for counsel=s deficiency, the result of the trial would have been different.  Strickland v. Washington, 466 U.S.
668, 687, 104 S. Ct. 2052, 2064 (1984); Salinas v. State, 163 S.W.3d
734, 740 (Tex. Crim. App. 2005); Mallett v. State, 65 S.W.3d 59, 62-63
(Tex. Crim. App. 2001); Thompson v. State, 9 S.W.3d 808, 812
(Tex. Crim. App. 1999). 








In evaluating the
effectiveness of counsel under the first prong, we look to the totality of the
representation and the particular circumstances of each case.  Thompson, 9 S.W.3d at 813.  The issue is whether counsel=s assistance was reasonable under all the circumstances and prevailing
professional norms at the time of the alleged error.  See Strickland, 466 U.S. at 688-89,
104 S. Ct. at 2065.  Review of counsel=s representation is highly deferential, and the reviewing court
indulges a strong presumption that counsel=s conduct fell within a wide range of reasonable representation.  Salinas, 163 S.W.3d at 740; Mallett,
65 S.W.3d at 63.  A reviewing court will
rarely be in a position on direct appeal to fairly evaluate the merits of an
ineffective assistance claim.  Thompson,
9 S.W.3d at 813-14.  AIn the majority of cases, the record on direct appeal is undeveloped
and cannot adequately reflect the motives behind trial counsel=s actions.@  Salinas, 163 S.W.3d at 740 (quoting Mallett,
65 S.W.3d at 63).  To overcome the
presumption of reasonable professional assistance, Aany allegation of ineffectiveness must be firmly founded in the
record, and the record must affirmatively demonstrate the alleged
ineffectiveness.@  Salinas, 163 S.W.3d at 740 (quoting Thompson,
9 S.W.3d at 813).








The second prong of Strickland
requires a showing that counsel=s errors were so serious that they deprived the defendant of a fair
trial, i.e., a trial whose result is reliable. 
Strickland, 466 U.S. at 687, 104 S. Ct. at 2064.  In other words, the appellant must show there
is a reasonable probability that, but for counsel=s unprofessional errors, the result of the proceeding would have been
different.  Id. at 694, 104 S. Ct.
at 2068.  A reasonable probability is a
probability sufficient to undermine confidence in the outcome.  Id. 
The ultimate focus of our inquiry must be on the fundamental fairness of
the proceeding whose result is being challenged.  Id. at 697, 104 S. Ct. at 2070.

2.  Failure To Request A Second, Death-Qualified
Attorney








Appellant contends that the
failure to unequivocally ask the trial court to appoint a second,
death-qualified attorney under code of criminal procedure article 26.052(e) is
an error for which no explanation of trial strategy is necessary.  Appellant refers us to Bone v. State,
77 S.W.3d 828, 836 (Tex. Crim. App. 2002), and Vasquez v. State, 830
S.W.2d 948 (Tex. Crim. App. 1992), to illustrate the difference between errors
that require that trial counsel be given an opportunity to explain and errors
that do not require an explanation of counsel=s trial strategy.  In Bone,
the court of criminal appeals determined that the complained-of errors, which
included failing to offer additional evidence during the punishment phase of
trial, offering damaging or prejudicial evidence, and making certain statements
during closing arguments, were all actions that trial counsel should have been
given the opportunity to explain.  77
S.W.3d at 834-37.  In Vasquez, the
court of criminal appeals determined that the failure to seek an instruction on
necessity would not have been an acceptable trial strategy under the facts of
the case and the failure to request the instruction sufficiently undermined the
court=s confidence in the conviction; thus, the court reversed the appellant=s conviction on direct appeal. 
830 S.W.2d at 949-51. 

Trial counsel=s alleged deficiency in failing to request a second, death-qualified
attorney is not the type of deficiency that no explanation of trial strategy
would be needed.  In light of the
prosecutor=s verbal
assurances that the death penalty would be waived, trial counsel could arguably
have a strategic reason for not demanding that the case be treated as a death
penalty case.  Counsel, by appearing to
rely on the prosecutors= assurances,
arguably could have thought that it would make it more difficult for the State
to later abandon its initial position that the death penalty should be
waived.   

The record does not reflect
trial counsel=s reasoning
for failing to immediately request a second, death-qualified attorney.  In the absence of counsel=s reasoning, the record is undeveloped and cannot adequately reflect
the motives behind trial counsel=s actions.  See Salinas,
163 S.W.3d at 740.  Here, the allegation
of ineffectiveness is not so firmly rooted in the record as to overcome the
presumption that trial counsel=s conduct falls within the wide range of professional competence.  See id.  Accordingly, we overrule Appellant=s second point. 

 

 








2.  Failure To Object

In his fourth point,
Appellant contends that his trial counsel was ineffective because he failed to
object to the admission of Appellant=s third statement to police on the grounds that at the time he made
the statement, he had not been appointed a second attorney as required by code
of criminal procedure article 26.052(e). 
Appellant argues that there could be no conceivable trial strategy for
not invoking article 26.052(e) in the context of attacking the statement;
however, Appellant has not argued that but for counsel=s alleged failure, the outcome of the proceeding would have been
different.

Appellant=s third statement was not so significant that, but for its admission,
the outcome of the proceedings would be different.  Appellant=s first two statements demonstrate his willingness to mislead the
authorities, and his  second statement
even places him at the scene of the crime at the time it was committed.  In light of the overwhelming evidence against
him, Appellant has failed to prove that there is a reasonable probability that,
but for counsel=s alleged
failure to object to the admission of his third statement, the outcome of the
proceeding would have been different.  See
Strickland, 466 U.S. at 694, 104 S. Ct. at 2068.  Accordingly, we overrule Appellant=s fourth point. 

 

 








CONCLUSION

Having overruled Appellant=s seven points, we affirm the trial court=s judgment.

 

 

DIXON W. HOLMAN

JUSTICE

 

PANEL
B:  DAUPHINOT, HOLMAN, and GARDNER, JJ.

 

PUBLISH

 

DELIVERED:  July 13, 2006











[1] We
discuss Appellant=s
ineffective assistance of counsel complaints in the final section of this
opinion. 





[2] See
Miranda v. Arizona, 384 U.S. 436, 86 S. Ct. 1602 (1966).